

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
MALKA REIZY MOSKOVITZ, SARAH
FEUERWERGER, BERL FRANKEL, MOSHE
ECKSTEIN, YISRUEL GOLDSTEIN, ISRAEL
FRIED, JACOB MOSKOVITZ and VICTOR
FRANKEL,

           Plaintiffs,

           v.

LA SUISSE, SOCIÉTÉ D'ASSURANCES SUR
LA VIE now known by Merger as
SCHWEIZERISCHE
LEBENSVERSICHERUNGS- UND
RENTENANSTALT,

      Defendant and Third-Party Plaintiff,

           v.

MOSES KRAUS and
CARUSO AG,

      Third-Party Defendants.
--------------------------------------------------------------X

Civil Action

No. 2006 Civ. 4404 (SCR)  (GAY)
**THIRD-PARTY COMPLAINT**



Third-party plaintiff Schweizerische Lebensversicherungs- und Rentenanstalt

("Swiss Life"), by its attorneys, Becker, Glynn, Melamed & Muffly LLP, alleges the following:

<u>INTRODUCTION</u>

1.     Plaintiffs Malka Reizy Moskovitz et al. have filed against defendant Swiss

Life and La Suisse Société D'Assurances Sur la Vie ("La Suisse") a complaint captioned

*Moskovitz v. La Suisse*, 06 CV 4404 (SCR) (GAY) ("*Moskovitz*"), a copy of which is attached.

2.     This is a third-party complaint by defendant Swiss Life, a Swiss insurance

company, against Moses Kraus ("Kraus") and the insurance brokerage company, Caruso AG.

("Caruso").  In 2005, Swiss Life merged with La Suisse, which sold the insurance policies that
are the subject of *Moskovitz*.  Prior to the merger, Swiss Life owned more than 90% of the shares
of La Suisse.

        3.      Kraus and Caruso acted as insurance brokers for La Suisse and, as such,
sold and marketed the insurance policies that are the subject of *Moskovitz*.

        4.      Swiss Life asserts two cross claims against Kraus and Caruso: an
indemnification claim and a claim under the Racketeer Influenced and Corrupt Organizations
Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

        5.      First, Swiss Life seeks indemnification from Kraus and Caruso for
violating their fiduciary duties to La Suisse by misrepresenting, or by failing to describe
correctly, the benefits of the policies to policyholders.  In *Moskovitz*, the policyholders seek
payment contrary to the terms of the policies.  To the extent that Swiss Life is obligated to pay
the policyholders because those terms were misrepresented or misdescribed by Kraus and
Caruso, Kraus and Caruso must indemnify Swiss Life.

        6.      Second, Swiss Life seeks damages under the RICO Act, 18 U.S.C. § 1961
*et seq*.  *Moskovitz* itself represents a recent chapter in a nearly twenty year scheme by Kraus,
Caruso and other insurance brokers to defraud and extort La Suisse and Swiss Life.

        7.      The first phase of the RICO scheme began in 1989 when Kraus, Caruso,
and other insurance brokers initiated their fraudulent scheme that ultimately cost La Suisse
hundreds of millions of Swiss francs.  The brokers intentionally misrepresented vital
demographic information regarding the population to which they were marketing the policies.
They concealed the fact that the insurance product they were selling in New York on behalf of
La Suisse would financially devastate La Suisse.  By selling the policies, Kraus, Caruso, and the

other brokers obtained millions of Swiss francs for themselves, both in commissions from the sale of each policy and, upon information and belief, by secretly owning, paying premiums, and earning benefits on many of the policies that had purportedly been purchased by the policyholders.

8.    *Moskovitz* represents a key part of the scheme.   Kraus and Caruso initiated and are currently financing and controlling *Moskovitz*.  But they did not commence *Moskovitz* for the benefit of the plaintiffs and nominal policyholders; rather, they initiated and are financing it as a tool to extort additional money from La Suisse.  Kraus has repeatedly told La Suisse that he would stop financing the lawsuit and cause the plaintiffs to withdraw their claims if La Suisse made payments directly to him, Caruso, or both.  He called this the "silent solution" or the "quiet solution."  Using his influence over policyholders, Kraus has also threatened to block any class action settlement unless Swiss Life compensates him directly. Kraus also offered to provide favorable testimony in exchange for compensation in connection with earlier, related actions against La Suisse, and has threatened to bring (and has brought) additional lawsuits against the company, including class actions in Israel, if he and Caruso are not compensated.

9.    Through such conduct, expanded upon below, Kraus and Caruso conducted or participated, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity in violation of the RICO Act, 18 U.S.C. § 1961 *et seq.*

## PARTIES, VENUE, AND JURISDICTION

10.    Swiss Life is an insurance company organized under the laws of Switzerland with its principal place of business at General-Guisan-Quai 40, CH-8022 Zurich, Switzerland.

11.     Swiss Life merged with La Suisse in November 2005.  La Suisse no longer exists as a separate corporate entity.

12.     Third-party defendant Caruso is a European brokerage firm organized under the laws of Lichtenstein with its principal place of business at c/o Stamford Hill, London N16 6XZ, England.

13.     Caruso transacts substantial business in New York State.

14.     Third-party defendant Kraus is a resident of England.  His address is 34 Fountayne Road, N 167 DT London, England.

15.     Kraus is an insurance broker affiliated with Caruso.

16.     Kraus transacts substantial business in New York State.  Kraus and Caruso sold close to 2,000 La Suisse policies in the U.S., mainly in New York.

17.     Kraus has submitted affidavits of fact in *Moskovitz*.

18.     Kraus has appeared personally in New York in connection with *Moskovitz*.

19.     This dispute is brought before this Court under Rule 14 of the Federal Rules of Civil Procedure as Swiss Life is seeking indemnification from Kraus and Caruso for its potential liability to the *Moskovitz* plaintiffs on their breach of contract claims.

20.     Joinder of Swiss Life's RICO claims against Kraus and Caruso is made under Rule 18 of the Federal Rules of Civil Procedure.

21.     This Court also has independent subject matter jurisdiction over this dispute under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331, and supplemental jurisdiction over the non-federal claims under 28 U.S.C. § 1367.

22.     Venue is proper because the *Moskovitz* litigation is before this Court, Kraus and Caruso transact substantial business in New York, and a substantial part of the events and omissions giving rise to the third-party claims occurred in New York.

## FACTUAL BASIS FOR ALL CLAIMS

### *The Initial Scheme:  Solicitation of La Suisse to sell Marriage Policies*

23.     The insurance policies involved in this case (the "Marriage Policies") are endowment policies with an unusual benefits structure that includes payment of benefits upon the marriage of the insured person.  Specifically, the Marriage Policies call for the payment of the "face value" of the policy (typically 100,000 Swiss francs) when the insured person reaches age 26, dies, or marries, whichever happens first.

24.     The plan to sell and market the Marriage Policies in New York was conceived of by insurance brokers (the "Brokers") from the Chassidic Jewish community in New York and elsewhere ("Chassidic community") who solicited the company in the late 1980's.

25.     In 1989, the Brokers solicited La Suisse to sell Marriage Policies because, unknown to La Suisse, they planned to sell the policies almost exclusively to members of the Chassidic community, mostly living in New York, who typically marry at ages far younger than La Suisse anticipated when it set the price for the annual premiums on the product.

26.     La Suisse entered into agreements with the Brokers that allowed the Brokers to sell the Marriage Policies in New York.  For example, Bituswiss S.A. ("Bituswiss") entered into an agency with La Suisse that permitted Bituswiss to sell Marriage Policies in New York.  Bituswiss sold approximately 4000 Marriage Policies.  Elias A. Horowitz ("Horowitz"), a resident of New York, is the sole shareholder of Bituswiss.  Dr. Berysz Rosenberg ("Rosenberg"), a resident of Switzerland, is the President of Bituswiss.

27.     Kraus and Caruso entered into an agreement with La Suisse that permitted them to sell Marriage Policies in New York.

28.     The agreements between the Brokers and La Suisse, including those specified in paragraphs 26-27, above, provided that the Brokers would earn commissions on the sale of each Marriage Policy.  The agreements further conferred upon the Brokers a duty of good faith, honesty, and loyalty towards La Suisse.

29.     In setting the price of the premiums for the Marriage Policies, and otherwise establishing their terms, La Suisse used an existing complementary insurance rider that was based on statistics about the marriage rates and ages of the Swiss population.

30.     The Brokers had informed La Suisse that they planned to market the Marriage Policies to the Jewish population at large.

31.     Statistics about marriage rates and ages of the Jewish population are consistent with statistics of the marriage rates and ages of the Swiss population.

32.     The marriage rates and ages of the Chassidic community, however, are far different from those of the Swiss or Jewish population generally.  The Brokers knew that the average marriage age of members of the Chassidic community is approximately 19 years of age, far lower than that of the Swiss or Jewish population generally.

33.     As a consequence of the Brokers' misrepresentations regarding the probable marriage ages and rates of the policyholders, the policyholders (or the ones who financed these policies) systematically gained unusually high returns because the insured persons would marry at ages far lower than the statistical assumptions La Suisse had used to set premiums.

6

34.     These extraordinary profits were realized because, on average, each policyholder (as a result of early marriage) paid approximately five fewer annual premiums than La Suisse expected when it priced the Marriage Policies while still receiving the full face value of the policy upon marriage.

35.     Because of these extraordinary returns, the brokers were able to sell thousands of policies, selling approximately 7,000 to residents of New York.

36.     La Suisse began to uncover the fraud in 1995. La Suisse immediately ceased all sales of new policies, but continued paying benefits on existing ones.

37.     La Suisse's decision to honor all of the policies has resulted in financial catastrophe for the company. After all the policies are paid (and most of them have been paid already), it projects that it will lose up to 300 million Swiss francs.

38.     La Suisse was just one of several European insurance companies that the Brokers persuaded to sell policies that paid benefits upon marriage. In each case, the Brokers misrepresented the marrying ages and rates of the population to which they planned to market the policies. Other insurance companies victimized by the Brokers' scheme include Winterthur Lebensversicherungs-Gesellschaft and Secura Lebensversicherungsgesellschaft.

39.     La Suisse relied on the Brokers' misrepresentations, detailed in paragraph 40-65, when setting the terms of the Marriage Policies, including the price of the premiums.

### Perpetuation of the Fraud

40.     At several points between 1989 and 1995, the Brokers, using misrepresentations, dissuaded La Suisse from altering the terms of the Marriage Policies.

41.     In order to prevent La Suisse from revising the terms of the Marriage Policies, and thus reducing the financial risks related to them, the Brokers, including Kraus and Caruso, repeatedly misrepresented the population to which they were selling and marketing the Marriage Policies. The following (paragraphs 42-64) is a sample of the misrepresentations made by various Brokers to La Suisse between 1989 and 1995.

42.     In a telephone conversation in September 1990, Kraus represented to Gerhard Mayer of La Suisse that most marriages would occur between the ages of 22 and 24.

43.     Kraus knew that this representation was false.

44.     La Suisse relied on this representation to its detriment.

45.     On October 10, 1990, Kraus told La Suisse that the company should not be concerned about the possibility that large numbers of policyholders would marry earlier than its assumptions indicated.

46.     Kraus knew that this representation was false.

47.     La Suisse relied on this representation to its detriment.

48.     On or about May 15, 1995, Kraus forwarded to La Suisse a letter he received from the Council of Jewish Federations dated May 15, 1995. The letter cited and contained statistics stating that the average age of first marriage for Jewish men is 29 and 26 for women.

49.     Kraus knew that receipt by La Suisse of the letter and statistics from the Council of Jewish Federations would persuade La Suisse that it had correctly relied on statistics for the marriage ages and rates of the Swiss population, as they were consistent with the statistics provided by the Council of Jewish Federations.

8

50.     La Suisse believed that the letter and statistics from the Council of Jewish Federations supported its reliance on statistics for the marriage ages and rates of the Swiss population, as they were consistent with the statistics of the Council of Jewish Federations.

51.     On February 21 and February 26, 1990, Horowitz sent a letter to La Suisse containing statistics regarding the marriage age of persons living in the United States.

52.     Horowitz knew that the letter sent to La Suisse containing statistics regarding the marriage ages of persons living in the United States would persuade La Suisse that it had correctly relied on statistics for the marriage ages and rates of the Swiss population, as they were consistent with the statistics regarding the marriage ages of persons living in the United States.

53.     La Suisse believed that the statistics regarding the marriage ages of persons living in the United States supported its reliance on statistics for the marriage ages and rates of the Swiss population, as they were consistent with the statistics regarding the marriage ages of persons living in the United States.

54.     In a memorandum dated March 18, 1990, to La Suisse from Rosenberg, Rosenberg represented that the market for the Marriage Policies included the over 3,000,000 Jewish persons living in New York.

55.     Rosenberg knew that the memorandum would cause La Suisse to believe that the Brokers were selling Marriage Policies to the entire Jewish population, rather than just the Chassidic community.

56.     Rosenberg knew that the Brokers were not selling the Marriage Policies to the entire Jewish population.

57.     Rosenberg knew that the Brokers were selling the Marriage Policies exclusively to the Chassidic community.

58.     La Suisse concluded from receipt of the memorandum that the Brokers were selling the Marriage Policies to the entire Jewish population.

59.     On November 2, 1990, Moses Aschnkenasy ("Aschnkenasy"), another Broker, told Gerhard Mayer of La Suisse that the average marrying age of the prospective policyholders would be 23 years of age.

60.     Aschnkenasy knew that the average marrying age of the prospective policyholders would not be 23 years of age.

61.     La Suisse relied to its detriment on Aschnkenasy's representation that the average marrying age of the policyholders would be 23 years of age.

62.     On or about December 14, 1993, Mr. Eckstein ("Eckstein"), another broker, forwarded La Suisse a letter he received from the Council of Jewish Federations dated December 14, 1993.  The letter includes data from marriage studies on Jewish Americans and states that "outside data seems to suggest that the average age for first marriage of American Jews is 26 and 28 respectively for women and men."

63.     Eckstein knew that receipt by La Suisse of the letter and statistics from the Council of Jewish Federations would persuade La Suisse that it had correctly relied on statistics for the marriage ages and rates of the Swiss population, as they were consistent with the statistics of the Council of Jewish Federations.

64.     La Suisse believed that the letter and statistics from the Council of Jewish Federations supported its reliance on statistics for the marriage ages and rates of the Swiss population, as they were consistent with the statistics of the Council of Jewish Federations.

10

65.    Though the Brokers competed with each other to sell and market the Marriage Policies, they conspired and coordinated their deception of the insurance companies, including La Suisse, as each stood to gain millions from the fraud.

### Broker Funding of the Policies

66.    Upon information and belief, part if not all the payment of premiums due on the Marriage Policies was financed by the Brokers or companies controlled by the Brokers.

67.    Upon information and belief, the Brokers, including Kraus and Caruso, paid the premiums on behalf of policyholders of Marriage Policies in exchange for the right to collect the benefits of the Marriage Policies.  The Brokers never informed La Suisse that, in many cases, they were the true party of interest.

68.    Advertisements placed by the Brokers in Yiddish language newspapers circulated in the Chassidic community state that the Brokers would cover the cost of the premiums, and that the nominal policyholders would not receive the policy benefit but would instead earn a small sum upon marriage in exchange for allowing the Brokers to use their name.

### Extortion and Bribery

69.    The Brokers used the threat of litigation and actual litigation to attempt to extort La Suisse and Swiss Life.

70.    In 1997, Horowitz initiated and financed the first in a series of policyholder lawsuits against La Suisse in New York:  *Kalman Weiss v. La Suisse*, 97 Civ. 1352 (CM)(MDF) (*"Kalman Weiss"*).  In *Kalman Weiss*, the policyholders asserted claims of breach of contract and discrimination under 42 U.S.C. § 1981.

71.     Horowitz attempted to leverage his control over the policyholders into a favorable settlement with Swiss Life.  Horowitz caused another action in New York to be brought against La Suisse:  *Isac Hirsch v. La Suisse* ("*Isac Hirsch*"), 04 Civ. 10251 (CM)(MDF).

72.     At a meeting with La Suisse executive on or about February 28, 2001, Kraus offered to provide favorable testimony for La Suisse in *Kalman Weiss* if he were compensated.  In the context of demands by Kraus that La Suisse make payments to him, he advised La Suisse executives that he could influence the jury in *Kalman Weiss* depending on how he chose to testify.  He also said that he had, in his possession, documents which could similarly sway the jury.  La Suisse ignored Kraus's unmistakable offer to provide favorable testimony for La Suisse if compensated and threat to testify against La Suisse if it refused to compensate him.

73.     With no payments from La Suisse, Kraus planned to testify for the plaintiffs in *Kalman Weiss*, but was disqualified because plaintiffs had not properly identified Kraus as a witness in the Pretrial Order.  Kraus attended the trial in *Kalman Weiss*.

74.     Other than several small awards based on misdirected payments, La Suisse prevailed in *Kalman Weiss*.

75.     In 2005, Kraus and Caruso filed the *Moskovitz* action, purportedly on behalf of the policyholders.  Kraus and Caruso pay all legal fees in *Moskovitz* and otherwise control the litigation.

76.     Kraus and Caruso have also initiated approximately 50 lawsuits in Switzerland and Israel against La Suisse and Swiss Life.

12

77.     Kraus and Caruso have engaged in a calculated and persistent effort to use the lawsuits already filed, including *Moskovitz*, to force Swiss Life to make payments directly to them.

78.     Kraus and Caruso's numerous extortionate acts relating to the policyholder lawsuits include:

    a.     On or about August 31, 2006, Kraus met with a representative of Swiss Life at the Geneva airport.  Kraus presented himself as a representative for Caruso and for the policyholders.  At the meeting, he threatened to file yet more lawsuits against Swiss Life in Switzerland (Zurich and Lausanne).  He threatened to block any formal class action settlement of *Moskovitz* unless Swiss Life made payments to him of CHF 1,000 per policyholder per policyholder involved.  (As the class is comprised of approximately 10,000 policyholders, Kraus effectively demanded a personal payment of approximately CHF 10,000,000 to permit Swiss Life to settle its claims with the policyholders).

    b.     At this same meeting, Kraus proposed a settlement which he called the "silent solution."  Under the "silent solution," Swiss Life would make a payment directly to Kraus and Caruso.  In exchange, Kraus promised to withdraw all policyholder lawsuits, including *Moskovitz*, and block other policyholders from asserting claims against Swiss Life in the future.  The principal draw of the "silent solution," as proposed by Kraus, was that it would cost Swiss Life approximately CHF 10,000,000 less than the class settlement, even after factoring in Kraus's demand of CHF 1,000 per class member to allow a class settlement.

c.      Kraus and Caruso have repeated the class settlement threat and "silent solution" proposals numerous times and have made countless threats to file additional lawsuits in the name of policyholders against Swiss Life if they were not compensated.

d.      For example, on or about December 15, 2006, Kraus sent Swiss Life several written settlement demands.  Following up on the "silent solution," two of the settlement demands did not provide for any payment directly to the policyholders, but instead provided for payment only to Kraus and Caruso.  In exchange for the payments to Kraus and Caruso, they would cause all lawsuits brought against Swiss Life by the policyholders to be withdrawn and prevent future lawsuits by policyholders.  The settlement demands made clear that Kraus and Caruso would be entitled to distribute payments made by La Suisse in their absolute discretion without any oversight, including keeping the payments themselves.

e.      In another follow up to the "silent solution," Kraus suggested, on or about June 13, 2007, in a telephone call with a Swiss Life representative, that he could easily cause *Moskovitz* to be withdrawn if Swiss Life would quickly enter into a "quiet" settlement that avoided disclosure to all class members.  He also threatened that the cost to Swiss Life of any settlement would increase if Swiss Life failed to accede to his demands because, according to Kraus, the dispute would be publicized and more class members would learn of the litigation and demand a part of such a settlement.

f.       Kraus threatened to finance and bring a class action on behalf of

the policyholders in Israel, similar to *Moskovitz*, if Swiss Life did not make

payments directly to him.  On or about December 29, 2006, he sent a draft of that

complaint, which was never filed, to attorneys for Swiss Life.

g.       On February 18, 2008, Kraus, in a telephone call to a Swiss Life

representative, repeated his threats.  Kraus, once again, implied that he would

cause *Moskovitz*, and other litigations against Swiss Life, to be withdrawn if

Swiss Life made direct payments to him.

79.     In 2005, Kraus illegally registered websites, in his own name, under the

domain names swiss-life.ch and la-suisse.com.  Kraus attempted to use his theft and

manipulation of the Swiss Life and La Suisse names to force Swiss Life to make payments to

him, stating that he would take the websites offline only if discussions concerning financial

payments progressed to his satisfaction.

80.     On August 19, 2005, the Commercial Court for Canton Zurich held that

Kraus had illegally misappropriated the Swiss Life and La Suisse trademarks as he used the web-

sites to spread false and defamatory information about Swiss Life and La Suisse as well as to

divert business to Swiss Life competitors.  The court further held that Kraus's uses of the website

"clearly damage the Swiss Life and La Suisse trademarks" and ordered Kraus to transfer the

domain names to Swiss Life.  The Commercial Court's ruling was affirmed by a Swiss appellate

court on March 6, 2006.

81.     On or about April 20, 2005, in a telephone conversation with a

representative of La Suisse, Kraus threatened to file a criminal complaint against Charles

Relecom, a La Suisse executive, if La Suisse did not engage in settlement discussions with him.

15

On or about March 30, 2007, Kraus threatened to file criminal charges against Swiss Life, to be used as evidence of fraud in *Moskovitz*, if a settlement with him could not be reached.

As And For A First Claim For Relief,
(Violation Of 18 U.S.C. § 1962(c) Against Kraus And Caruso)

82.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 81 as constituting and describing defendants' schemes and artifices to extort and otherwise obtain money and property through wrongful means.

***Defendants***

83.     Kraus and Caruso is each a "person" as defined in 18 U.S.C. § 1961(3).

***Predicate Acts***

Extortion

84.     Beginning in at least 2004 and continuing to the present, Kraus and Caruso have attempted to leverage their control and influence over the policyholders by instituting policyholder litigations against Swiss Life, such as *Moskovitz*, and otherwise threatening Swiss Life in an attempt to extort Swiss Life into making payments directly to Kraus and Caruso. Each threat to initiate a policyholder lawsuit or promise to withdraw such a lawsuit if Swiss Life makes a payment to Kraus/Caruso constitutes a violation of 18 U.S.C. § 1951. Each threat to prevent a class action settlement in *Moskovitz* unless Swiss Life makes a payment directly to Kraus or Caruso constitutes a violation of 18 U.S.C. § 1951.

85.     Kraus's threats of harm to Swiss Life and any harm suffered by Swiss Life relating to his manipulation and misuse of the swiss-life.ch and la-suisse.com domain names (directed at U.S. policyholders) in 2005 unless Swiss Life made payments to him constitutes a violation of 18 U.S.C. § 1951.

16

86.     Kraus's threats, made on or about April 20, 2005, and communicated to a La Suisse representative, to file criminal complaints against Mr. Relecom, a Swiss Life and former La Suisse executive, constitutes an additional violation of 18 U.S.C. § 1951.

87.     Each and every threat made by Kraus to portray Swiss Life's treatment of its Chassidic policyholders negatively in the media in Switzerland and the United States (such threats started in 2001 and continue today) if he and Caruso were not compensated constitutes a further violation of 18 U.S.C. § 1951.

88.     Kraus's threat, made on or about February 28, 2001 (and any others like it), to testify against La Suisse in *Kalman Weiss* unless he was compensated by La Suisse constitutes an additional violation of 18 U.S.C. 1951.

89.     Kraus and Caruso's extortionate threats (some of which were acted upon), detailed above, put Swiss Life in fear of economic injury and did and continue to cause Swiss Life economic harm.

90.     Each and every act of extortion committed by Kraus and Caruso affect "commerce," as that term is defined in 18 U.S.C. 1951(b)(3).  Each threat derives from and impacts the payment of benefits to policyholders in New York and around the world as well as the various litigations between the policyholders and La Suisse/Swiss Life in New York and around the world.

Bribery

91.     On or about February 28, 2001, Kraus offered to provide favorable testimony to La Suisse and withhold what he considered incriminating documents in the context of the *Kalman Weiss* litigation in exchange for compensation.  This constitutes a violation of 18 U.S.C. § 201.  Kraus later attempted to influence the *Kalman Weiss* litigation by testifying

17

against La Suisse.  It was only plaintiffs' failure to list Kraus as a witness and Judge McMahon's ruling that Kraus could not testify that thwarted Kraus's attempt to harm La Suisse through his testimony.

### Mail and Wire Fraud

92.     Beginning in at least 1989, and continuing to at least 1995, Kraus, Caruso and the other Brokers perpetrated a massive fraud against Swiss Life (detailed in paragraphs 23-65).  In conducting their fraudulent scheme, the brokers made extensive use of the mails and wires, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  Marriage Policies and information concerning the Marriage Policies was sent via mail and wire.  Many of these communications were sent to and from the United States.  The fraud would not have been possible had the Brokers not used the mails and wires to send and receive the Marriage Policies and information concerning the Marriage Policies.

93.     This massive scheme gives rise to countless predicate acts of mail and wire fraud under RICO.  The fraud helps establish a pattern of racketeering and gives context to the related racketeering activity that continues today.

### *Enterprise*

94.     The members of the Chassidic community who purchased the Marriage Policies (the policyholders) constitute an enterprise under 18 U.S.C. 1961(4) that has been corrupted by Kraus, Caruso and the other Brokers.  Alternatively, an association in fact of the Brokers and sub-brokers who sold and marketed marriage insurance to the Chassidic community (the association includes Kraus, Caruso, Bituswiss, Horowitz, Daniel Beck, Moses Aschkenasy, Solomon April, Meyer Katz, Heinrich Brandeis, Rachel Rabinovitsch, and other brokers and sub-brokers who marketed and sold the Marriage Policies, or any subset thereof) constitutes an

18

enterprise under 18 U.S.C. 1961(4). (Either or both are hereinafter referred to as the "Marriage Policy Enterprise").

95.    The purpose of the Marriage Policy Enterprise is to defraud and extort life insurance companies, such as Swiss Life, who were tricked by the Brokers into selling marriage insurance to members of the Chassidic community.

96.    The Marriage Policy Enterprise is engaged in, and its activities affect, interstate and foreign commerce. The Brokers directed their sales activity to New York and the United States. Most of the policies were purchased in New York by residents of New York (over 7,000 policyholders are located in the United States, nearly all of them in New York). Numerous other threats and acts occurred in New York, such as the initiation of policyholder litigations against Swiss Life and the Brokers' threat to publicize the dispute.

97.    The participants in the Marriage Policy Enterprise include third-party defendants Kraus and Caruso and non-defendants Horowitz, Bituswiss, Rosenberg, Shimon Israël Kraus (Kraus's father) and other brokers and sub-brokers who marketed and sold the Marriage Policies.

98.    With respect to Kraus and Caruso, they sold the Marriage Policies from 1989-1995 and have played a pivotal role in the other affairs of the Marriage Policy Enterprise by initiating numerous lawsuits, purportedly on behalf of the policyholders, and otherwise threatening Swiss Life.

### *Relatedness and Continuity*

99.    From at least 1989 and continuing to the present, in the Southern District of New York and elsewhere, the Brokers, including Kraus and Caruso, repeatedly engaged in acts indictable under 18 U.S.C. §§ 1341 (relating to mail fraud), 1343 (relating to wire fraud),

1951 (relating to extortion) and 201 (relating to bribery) and thereby continually engaged in racketeering activity within the meaning of 18 U.S.C. 1961(1)(b).

100.    Kraus and Caruso's (and other Brokers who participated in the scheme) violations of 18 U.S.C. §§ 1341, 1343, 1951 and 201 extended over a period of years (at least from 1989-2008) and involved distinct and independent criminal acts. They were neither isolated nor sporadic events, but involved regular and repeated violation of law to accomplish the defendants' desired ends in the course of the continuing business of the Marriage Policy Enterprise. These acts were related to each other by virtue of (a) common participants—the Brokers, (b) common victims—La Suisse, Swiss Life, and other life insurance companies, (c) common methods of commission, and (d) the common purpose of looting, defrauding and extorting life insurance companies such as La Suisse and Swiss Life.

### *Injury*

101.    Kraus and Caruso's violations of 18 U.S.C. § 1962(c) proximately caused, to date, Swiss Life to suffer direct injury to its business and property, including legal fees incurred in defending against Kraus's extortionate lawsuits in New York, Switzerland and Israel, and other damages and losses described above.

### As And For A Second Claim For Relief, (Violation Of 18 U.S.C. § 1962(a) Against Kraus and Caruso)

102.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 101 as constituting and describing the enterprise and the schemes and artifices to defraud, extort and otherwise obtain money and property through wrongful means.

103.    Upon information and belief, Kraus and Caruso paid the premiums or otherwise financed many of the Marriage Policies that they and the other Brokers sold to the

policyholders. Thus, not only did Kraus and Caruso receive commission payments from Swiss Life for brokering the sale of the Marriage Policies, but also often receive the benefit payments.

104.    Generally, the Brokers acted as middlemen between Swiss Life and the policyholders. Benefits under the Marriage Policies and premium payments were paid to and came from the Brokers or companies controlled by the Brokers, who were agents designated by the policyholders to make premium payments on behalf of the policyholders and receive benefits that they were then to distribute to the policyholders. Upon information and belief, Kraus and Caruso entered into an agreement with many of the policyholders whereby they would pay the premiums under the policies and would share in the payment of benefits.

105.    Upon information and belief, Caruso and Kraus are using the funds received from the payment of benefits and receipt of commissions to finance the lawsuits initiated, purportedly in the name of policyholders, against Swiss Life.

106.    Kraus and Caruso are reinvesting income derived from the pattern of racketeering activity into Caruso and that money has been used to finance the lawsuits against Swiss Life in violation of 18 U.S.C. § 1962(a).

107.    Defendants' violation of 18 U.S.C. §1962(a) proximately caused Swiss Life to suffer direct injury to its business and property in the form of legal fees defending against Kraus's extortionate lawsuits in New York, Switzerland and Israel.

As And For A Third Claim For Relief<br>(Breach Of Fiduciary Duty Against Kraus And Caruso)

108.    Kraus and Caruso, and any sub-brokers whose acts can be imputed to Kraus and Caruso, as insurance brokers of La Suisse insurance policies, owed both La Suisse and the policyholders a duty to accurately represent and explain the terms of the policies.

21

109.    Both the policyholders and La Suisse relied on the Brokers, such as Kraus and Caruso, to present and accurately explain the terms of the policies to the policyholders (as is customary in the insurance industry).

110.    The plaintiffs in *Moskovitz* assert a broad range of breach of contract claims against Swiss Life.

111.    In its answer to the *Moskovitz* complaint, Swiss Life denies the allegations of breach raised by the *Moskovitz* plaintiffs.

112.    Upon information and belief, Kraus and Caruso may have intentionally misrepresented, exaggerated or failed to explain the policy terms in a manner consistent with their duties to Swiss Life and the policyholders.

113.    For example, Kraus and Caruso were given clear instructions and explanations regarding the meaning of the Marriage Policies' age 19 clause—that the face amount of the policy is reduced if the insured marries before turning 19.  Upon information and belief Kraus and Caruso fully understood this to be the meaning of the age 19 clause.

114.    In *Moskovitz*, the plaintiffs allege that the face amount of the policy should only be reduced if the insured marries before reaching his or her 19th year, effectively turning the clause into an age 18 clause.  To the extent that Swiss Life is held liable because Kraus and Caruso failed to explain the meaning of the clause to prospective policyholders or intentionally misrepresented its meaning so as to make the polices more attractive to prospective policyholders, Swiss Life is entitled to indemnification from Kraus and Caruso.

115.    Kraus and Caruso's breach of duty is particularly egregious for those Marriage Policies that they themselves are financing.

116.    To the extent that Swiss Life is liable based on the failure of Kraus and Caruso to explain the terms of the Marriage Policies properly, or based on any misrepresentations regarding the policy terms made by Caruso and Kraus, Swiss Life is entitled to reimbursement from Caruso and Kraus, jointly and severally, for that amount.

WHEREFORE, Swiss Life demands judgment against Kraus and Caruso as follows:

A.    On the First Claim, for violations of the Racketeer Influenced and Corrupt Organizations Act, for treble damages against all third-party defendants, jointly and severally, in an amount to be proven at trial, together with prejudgment interest, costs and attorneys' fees. Additionally, Swiss Life requests injunctive relief against all third-party defendants, available under 18 U.S.C. 1964(a), restraining them from engaging in any further racketeering activity, specifically, financing policyholder litigations against Swiss Life.

B.    On the Second Claim, for violations of the Racketeer Influenced and Corrupt Organizations Act, for treble damages against all third-party defendants, jointly and severally, in an amount to be proven at trial, together with prejudgment interest, costs and attorneys' fees. Additionally, Swiss Life requests injunctive relief against all third-party defendants, available under 18 U.S.C. 1964(a), restraining them from engaging in any further racketeering activity, specifically, financing the policyholder litigations against Swiss Life.

C.    On plaintiff's Third Claim, for breach of fiduciary duty, for such damages as may be proved upon trial of the action, including any contract damages Swiss Life might be required to pay to plaintiffs.

Dated:  New York, New York
         March 17, 2008

BECKER, GLYNN, MELAMED & MUFFLY LLP
Attorneys for Defendant and Third-Party Plaintiff
Schweizerische Lebensversicherungs- und
Rentenanstalt

By: _____
           Richard N. Chassin
           A Member of the Firm
299 Park Avenue
New York, New York  10171
(212) 888-3033
(RNC 8365)

*94415 v10*

24