UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MALKA REIZY MOSKOWITZ, SARAH
FEUERWERGER, BERL FRANKL, MOSHE
ECKSTEIN, YISRUEL GOLDSTEIN, ISRAEL
FRIED, JOSEPH MOSKOWITZ and VICTOR
FRANKL,[1]

        Plaintiff,

        -against-

LA SUISSE, SOCIETE D'ASSURANCES SUR
LA VIE now known by Merger as
SCHWEIZERISCHE LEBENSVERSICHERUNGS-
UND RENTENANSTALT,

        Defendant and Third-Party Plaintiff,

        -against-

MOSES KRAUS and CARUSO AG,

        Third-Party Defendants.
-------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

06 Civ. 4404 (SCR) (GAY)

TO THE HONORABLE STEPHEN C. ROBINSON, United States District Judge:

    Plaintiffs Malka Reizy Moskowitz, Sarah Feuerwerger, Berl Frankl, Moshe

Eckstein, Yisruel Goldstein, Israel Fried, Joseph Moskowitz, and Victor Frankl

---

[1] The depositions, exhibits, and parties' papers inconsistently spell many of the plaintiffs' names. Accordingly, the caption has been corrected as follows: Malka Reizy Moskovitz is now Malka Reizy Moskowitz; Berl Frankel is now Berl Frankl; Victor Frankel is now Victor Frankl; and Jacob Moskovitz is now Joseph Moskowitz. This latter plaintiff's name appears as Jacob Moskovitz, Joseph Moskovitz, and Joseph Moskowitz. At deposition, a Joseph Moskowitz testified to the spelling of his name and that he is a plaintiff in this action. Decl. of Jason D. Minard, Ex. G, Joseph Moskowitz Dep. at 4:7-17; 5:15-6:7; 10:21-23. No other deposition exists of a person with a similar name. For the remaining plaintiffs, the Court makes individual note of the variations in name, but to maintain consistency, conforms to the caption spellings.

(collectively "plaintiffs" or "Policyholders") bring this action against Defendant and Third-Party Plaintiff, La Suisse, Société D'Assurances sur la Vie, now known by merger as Schweizerische Lebensversicherungs-Und Rentenanstalt ("La Suisse").  Plaintiffs assert breach of contract claims regarding policies and loans issued by La Suisse.[2]  La Suisse also brings an action against third-party defendants Moses Kraus ("Kraus") and Caruso AG ("Caruso").  La Suisse asserts Racketeer Influenced and Corrupt Organizations ("RICO") claims pursuant to 18 U.S.C. § 1962(a) and (c); and breach of fiduciary duty.  Presently before this Court are two motions: (1) Kraus' motion to dismiss the third-party complaint pursuant to Rules 12(b)(2) of the Federal Rules of Civil Procedure ("FRCP") and (2) plaintiffs' motion to certify a class action.  For the reasons that follow, I respectfully recommend that Kraus' motion to dismiss should be DENIED and plaintiffs' motion to certify a class action be DENIED.

## I.  BACKGROUND

Plaintiffs are members of Chassidic Jewish communities in New York State and reside or used to reside in Brooklyn, New York.[3]  La Suisse is a foreign corporation duly organized and existing under the laws of Switzerland, with its principal place of business in Lausanne, Switzerland.  From 1988 to 1995, La Suisse sold "mixed life", or endowment, insurance policies on the life of a child ("Marriage Policies") in New York State through several authorized brokers and representatives.  Caruso, a European brokerage firm, with a principal place of business in London, England, is one of said

---

[2] By Order filed December 5, 2007, District Judge Stephen C. Robinson dismissed all of plaintiffs' fraud claims.  Docket # 16.

[3] As of November 2003, Mr. Eckstein lives in Montreal, Canada.

brokers.  Kraus is a resident of London, England.  He is an insurance broker affiliated

with Caruso.  He also had an affiliation with another brokerage firm, Bituswiss S.A.

("Bituswiss").

Kraus signed an agreement between Caruso and La Suisse which permitted him

to sell the Marriage Policies in New York.[4]  The Marriage Policies paid benefits to the

named beneficiary, a child of the policy purchaser, when the beneficiary died, married,

or reached a certain age without marrying.  The policyholders paid annual premiums,

earned dividends on the Marriage Policies, and could borrow against them after a

certain amount of time.  In soliciting the broker arrangement with La Suisse to sell these

Marriage Policies, Kraus (along with other brokers) allegedly misrepresented to La

Suisse the marriage rates and ages of the targeted Chassidic communities.  This

caused La Suisse to base the Marriage Policy premiums on the allegedly

misrepresented rate and ages.  When the children married at far earlier ages than

projected, the policyholders paid approximately five fewer annual premiums than La

Suisse expected and reaped a favorable rate of return.  As such, Kraus (and the other

brokers) were able to sell thousands of Marriage Policies to the Chassidic communities.

La Suisse sustained significant monetary losses from these Marriage Policies.

However, the brokers benefitted greatly because they earned a commission for each

policy they sold to the Chassidic communities.  Moreover, La Suisse alleges that Kraus

paid all or most of the premiums he sold on behalf of the policyholders.  La Suisse

---

[4] In connection with Bituswiss, La Suisse paid to Bituswiss Kraus' commissions
for certain applications solicited in New York.  Bituswiss then compensated Kraus.
Nevertheless, all policies and applications were sent directly to Kraus.

contends that Kraus solicited the sales of the Marriage Policies in this manner. Specifically, La Suisse asserts that the brokers placed advertisements in Yiddish newspapers circulated in their Chassidic communities, offering that the brokers would pay the premiums on the Marriage Policies. The brokers stated that the policyholders would not receive the policy benefits, but would receive a sum of money upon the marriage of the named child in exchange for the use of the policyholders' names.

As example of Kraus' involvement with the Marriage Policies he sold, on August 2, 1995, Kraus directed La Suisse to pay annual premiums for twenty policies against outstanding credits from commissions due to Caruso. In another example, on May 10, 1997, a non-party policyholder, Pesach Kuten, granted Kraus indefinite power of attorney to obtain loans to pay for the premiums on his Marriage Policy. Kraus also applied for a loan, on behalf of plaintiff Sarah Feuerwerger's father, Moishe Feuerwerger, prior to July 1996, to pay a Marriage Policy premium due on July 1, 1996. On separate occasions, but within one month of subsequent premium due dates, Kraus did the same for the Feuerwerger premiums due July 30, 1999; July 30, 2000; and August 31, 2001. Kraus also applied for loans on behalf of plaintiffs Berl and Victor Frankl to pay for the Marriage Policy premiums due on August 1, 1997; August 31, 1998; August 31, 1999[5]; August 31, 2000; July 31, 2001; August 31, 2002; August 31, 2003; August 31, 2004; and August 31, 2005. Moreover, Kraus applied for, and signed a loan on January 31, 2003, to pay allegedly past due premiums and interest for the

---

[5] In addition, Kraus signed the loan documents for the August 31, 1999 loan on February 10, 2000.

Frankl Marriage Policy.  On November 24, 2004, Kraus signed another loan contract on the Frankl Marriage Policy to pay for allegedly past due premiums.

La Suisse ceased issuing new Marriage Policies in 1995, when it uncovered that the brokers made misrepresentations about the Chassidic communities' marriage rate. La Suisse contends that it continued to pay the benefits of the existing Marriage Policies.  However, plaintiffs contend that La Suisse failed and delayed paying in full the contractual benefits due to them under the policy.  Plaintiffs further contend that La Suisse breached its contractual obligations pursuant to the Marriage Policies by, included but not limited to: backdating policy start dates to cause accelerated premium payment due dates; backdating premium due dates in order to charge late interest; levying penalties by wrongfully claiming that marriages occurred prior to the child's nineteenth birthday; failing to prorate early marriage deductions by monthly rather than full-year increments; and requiring unnecessary and illegal documentation for proof of marriage.  Plaintiffs also assert that La Suisse breached its contractual obligations pursuant to loan agreements against the Marriage Policies by, including but not limited to: backdating loan contracts to overcharge interest; double-charging late interest as "premium" and "late interest"; increasing late interest rates to 7.5% in contravention of Swiss law which limited such interest rate to 5%; and charging excessive interest rates outside the scope of the policy terms with respect to policy loans.

Subsequent to the alleged breaches, Kraus (and Caruso) allegedly filed numerous actions against La Suisse in the name of policyholders to extort settlement payments from La Suisse which would be paid directly to him.  La Suisse contends that Kraus initiated approximately fifty (50) lawsuits against La Suisse in Switzerland and

Israel.  La Suisse asserts that Kraus controlled a case filed in the Southern District of New York on February 26, 1997, Weiss v. La Suisse, No. 97 Civ. 1352.  La Suisse also contends that Kraus (and Caruso) filed the present action, originally filed in the Eastern District of New York on June 2, 2005; pays the fees associated with it; and otherwise controls the litigation.  At the very least, Kraus attended proceedings in the Weiss case and obtained counsel for the Policyholders in the present action.  See infra § II(B)(1) (further explaining said involvement by Kraus).

With regard to the alleged extortion, on or about February 21, 2001, at a meeting with a La Suisse executive, Kraus allegedly offered to provide favorable testimony for La Suisse in Weiss if the company paid him.  On or about August 31, 2006, Kraus met with a La Suisse representative at the Geneva airport.  Kraus threatened to file actions against La Suisse in Switzerland on behalf of New York policyholders.  In addition, Kraus suggested that if La Suisse made such payment, he would withdraw the present action and all other actions, and "block" other policyholders from asserting future claims.  On or about December 15, 2006, Kraus sent several written demands repeating this "settlement" demand.  On or about December 29, 2006, Kraus sent a draft complaint to La Suisse describing a class action on behalf of policyholders in Israel.  On or about June 13, 2007, Kraus stated in a telephone call with a La Suisse representative that he could cause the present action to be withdrawn if La Suisse made direct payments to him.  On or about February 18, 2008, Kraus spoke with a La Suisse representative by telephone and repeated his threats and "settlement" demands.

Kraus also registered website domain names "swiss-life.ch" and "la-suisse.com" in his own name.  He allegedly registered the names as leverage to force La Suisse to

6

make direct payments to him.  However, on August 19, 2005 the Commercial Court for Canton Zurich held that Kraus illegally misappropriated the domain names.  The court also held that Kraus used the websites to spread false and defamatory information about La Suisse, and divert business away from it.  The court further ordered Kraus to transfer the domain names to La Suisse.

Moreover, Kraus also threatened criminal charges against La Suisse.  On or about April 20, 2005, Kraus made such a threat to a La Suisse representative via telephone.  He said that he would file a criminal complaint against La Suisse executive Charles Relecom unless La Suisse engaged in "settlement" discussions with him.  On or about March 30, 2007, Kraus again threatened to file criminal charges against La Suisse if La Suisse failed to "settle" with him.  He said that he would file such charges and use the filing as evidence of fraud in the present action.

The present action commenced in the Eastern District of New York ("E.D.N.Y"), under civil number 05 Civ. 2670, on June 2, 2005.  See Class Action Complaint, S.D.N.Y Docket #1-1 [hereinafter "Class Action Complaint"].  On March 20, 2006, an Amended Complaint was filed.  Amended Complaint, S.D.N.Y. Docket #22-1 [hereinafter "Amended Complaint"].  The action was transferred to the Southern District of New York on June 12, 2006.

## II.  THIRD-PARTY COMPLAINT

7

A.  Motion to Dismiss Standard

In a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the FRCP, determining whether a court retains personal jurisdiction over a party requires a two-part analysis.  Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005) (citation omitted).  The court first determines "whether, under the laws of the forum state (New York in this case), there is jurisdiction over the" party.  Id. (citation omitted).  If jurisdiction does exist under the laws of the forum state, then the court must determine whether the exercise of said jurisdiction is consistent with federal due process requirements.  Id. (citation omitted); Cutting Edge Enters. v. Nat'l Ass'n of Attorneys Gen., 481 F. Supp. 2d 241, 245 (S.D.N.Y. 2007) (citation omitted).  To satisfy this latter requirement, the defendant must have sufficient contact with the "forum state to ensure that the 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  Regency Capital, LLC v. Corpfinance Int'l, Inc., No. 02 Civ. 5615, 2003 WL 22400200, at *2 (S.D.N.Y. Oct. 20, 2003) (quoting Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002)).

The burden is on the plaintiff, or here the third-party plaintiff, to establish that the court has jurisdiction over the third-party defendant.  Grand River Enters. Six Nations, 425 F.3d at 165 (citation omitted).  In addition, where the court has not conducted an evidentiary hearing on the motion to dismiss for lack of personal jurisdiction, as is the case here, the court must determine whether the third-party plaintiff made a "'prima facie showing of jurisdiction through its own affidavits and supporting materials.'"  Id. (citation omitted).  In making said determination, the court "is permitted to construe jurisdictional allegations liberally and to take all uncontroverted factual allegations to be

8

true." Dale v. Banque SCS Alliance S.A., No. 02 Civ. 3592, 2004 WL 2389894, at *3 (S.D.N.Y. Oct. 22, 2004) (quoting Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 2004)).  Moreover, "[i]f, as is the case here, affidavits are submitted, the Court is to resolve factual disputes in the [third-party] plaintiff's favor."  Navaera Sciences, LLC v. Acuity Forensic Inc., No. 09 Civ. 3791, 2009 WL 3617580, at *3 (S.D.N.Y. Nov. 3, 2009) (citation omitted).

    B. Personal Jurisdiction

    Kraus filed the present motion to dismiss on July 30, 2008.  He contends that New York's general jurisdiction statute, C.P.L.R. §301, and its long-arm jurisdiction statute, C.P.L.R. §302, do not extend personal jurisdiction over him.  Kraus contends that his contacts with the Policyholders are too remote to confer personal jurisdiction pursuant to §301 because they occurred at least fourteen years ago.  He further contends that communications he had with La Suisse between 2001 and 2004 cannot establish personal jurisdiction pursuant to §301 because the parties entered into an agreement whereby the statements from those meetings are inadmissible for any purpose in any forum.  He also asserts that he did not conduct business in New York within the meaning of §301.  In addition, Kraus contends that the provisions of §302 do not apply because there is no nexus between the sales of the Marriage Policies and La Suisse's RICO claims, the alleged tortious activity of which La Suisse complains did not occur in New York, and New York is not the situs of La Suisse's alleged injuries. Finally, Kraus contends that even if the statutory requirements are met, the Court's assertion of personal jurisdiction violates due process because of his lack of contacts with New York.

9

Section 301 provides that a "court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."  N.Y. C.P.L.R. §301.  The statute codifies "jurisdiction previously recognized at common law."  Anderson v. Indiana Black Expo, Inc., 81 F. Supp. 2d 494, 500 (S.D.N.Y. 2000) (citation omitted). Specifically, it confers jurisdiction on a non-domiciliary "'engaged in such a continuous and systematic course of doing business [in New York] as to warrant a finding of its presence in [that] jurisdiction.'"  Dale, 2004 WL 2389894, at *3 (citation omitted) (alteration in the original).  "Without any physical presence in New York, a foreign defendant may be subject to suit in New York if it conducts, or purposefully directs, business 'not occasionally or casually, but with a fair measure of permanence and continuity.'"  Anderson, 81 F. Supp. 2d at 500 (quotation and citations omitted).

Section 302 provides for personal jurisdiction over a non-domiciliary who (1) "transacts any business within the state or contracts anywhere to supply goods or services in the state;" (2) "commits a tortious act within the state," except for causes of action for defamation of character; (3) "commits a tortious act without the state causing injury to person or property within the state" except for causes of action for defamation of character, if the person engages in regular business in the state or "derives substantial revenue from goods used or consumed or services rendered" in the state, or "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;" or (4) "owns, uses or possesses any real property situated within the state;" and the cause of action arises from one of the above-listed acts.  N.Y. C.P.L.R. §302(a)(1)-(4) (emphasis added).

Pursuant to §302(a)(1), "[a] claim arises out of a party's transaction of business when there is a 'substantial nexus' between the transaction and the cause of action sued upon." Anderson, 81 F. Supp. 2d at 501 (citation omitted). The non-domiciliary party must have purposefully availed itself "'of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws.'" Dale, 2004 WL 2389894, at *4 (quoting Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999)). In determining whether the non-domiciliary "has engaged in some purposeful activity in New York in connection with the matter in controversy," the court looks "to the totality of the circumstances." Anderson, 81 F. Supp. 2d at 501 (citation omitted). Sporadic or casual acts, or a single business transaction, are sufficient to confer jurisdiction pursuant to §302(a)(1) where the nature and quality of the non-domiciliary's contact with New York are significant. See id. (quotations and citations omitted). For example, solicitation of business by itself cannot establish personal jurisdiction. Id. (citation omitted). However, where such solicitation "'is substantial and continuous, and [the] defendant engages in other activities of substance in the state,'" then the court would have personal jurisdiction over the non-domiciliary. Id. (citation omitted).

### 1. Transacting Business in New York

Construing La Suisse's allegations liberally, and taking as true all uncontroverted facts, the Court concludes that §302(a)(1) confers personal jurisdiction upon Kraus. Kraus transacted business in New York when he sold Marriage Policies; and negotiated, applied for, and signed loans for the Policyholders to maintain the policy premiums. Kraus does not deny that he advertised in New York Chassidic community newspapers

11

to purchase Marriage Policies in New Yorkers' names in exchange for a small fee. Although Kraus denies directly selling any Marriage Policies at any time, other facts demonstrate the opposite.  Kraus admits he worked for Caruso and was the brokerage firm's power of attorney.  See United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 206 (S.D.N.Y. 2002) (citation omitted) ("C.P.L.R. [§] 302(a)(1) does not . . . 'insulate [fiduciaries acting on behalf of a corporation] from long-arm jurisdiction for acts performed in a corporate capacity.'").

In addition, correspondence between Kraus and La Suisse demonstrates that Kraus singly managed his New York applications and used a brokerage firm for accounting purposes only.  See, e.g., Decl. of David Burkhard, Ex. A, Letter from M. B. Kraus to General Management, La Suisse (June 27, 1990).  In a letter dated June 27, 1990, Kraus directed La Suisse to label Bituswiss as the agency on certain New York applications it received from him.  Id.  Kraus explained that this enabled "the accounting" to go through Bituswiss who would then pay his commission directly to him. Id.  Kraus also directed that La Suisse "ensure that the policies and applications, as well as any copies thereof, be directed strictly to [his] attention" and explicitly denied consent to La Suisse's "disclosure of individual dossiers or applications to Bituswiss . . . ."  Id.

Kraus also claims that he did not profit from the Marriage Policies.  However, Caruso and Kraus clearly earned substantial sums from commissions they made on sales of the Marriage Policies.  For example Caruso and Kraus earned sufficient commissions in one month so that, upon Kraus' direction, La Suisse offset the premiums and interest owed on twenty policies in August of 1995 from "outstanding credit from commissions accrued in July."  Decl. of David Burkhard, Ex. D, Letter from

M. B. Kraus (Aug. 2, 1995). The total amount paid from the commissions was 135,443.35 Swiss francs. Additionally, Kraus does not contest any of the allegations regarding negotiating, applying for, and signing loan applications against the Marriage Policies in order to pay the premiums and late interest owed on those policies.

Further, Kraus admits that he made three trips to New York between 1993 and 1994 to meet with brokers regarding the Marriage Policies sold under the agreement between Caruso and La Suisse. Kraus was also present in New York in January and February of 2004, attending proceedings in the Weiss case. He states that he was there as a spectator, and because of his acquaintance with a principal at Bituswiss, the brokerage which sold the policies subject to the Weiss lawsuit. However, as described above, Kraus funneled money through Bituswiss for Marriage Policies he sold directly. Kraus also admits that "between 2001 and the present," he met with La Suisse in Europe to negotiate settlement agreements for separate lawsuits (discussions which he claims are bound by confidentiality agreements). Kraus further admits that he had extensive involvement between May 2005 and January 17, 2006[6], through the internet, emails, and telephone calls to New York, in finding counsel for the current Policyholders in the present action.

These activities reflect Kraus' substantial involvement with Marriage Policies to sold New Yorkers. Kraus began his contacts in New York as far back as 1989 and

---

[6] Kraus stated the date as January 17, 2005. However, following the flow of events, the Court presumes a typographical error occurred and the actual year is 2006. See also Decl. of Jesse T. Conan in Opp. to Mot. to Dismiss, Ex. A, Email from Richard M. Mahon, II to M. B. Kraus (Jan. 17, 2006) (Mr. Mahon affirmed his firm's representation of the Policyholders and explained the hourly rates for which Kraus would be responsible.)

continued at least until November 24, 2004, when he signed a loan contract on the Frankl Marriage Policy. Cf. Schenker v. Assicurazioni Genereali S.p.A., Consol., No. 98 Civ. 9186, 2002 WL 1560788, at *4 (S.D.N.Y. July 15, 2002) (citations omitted) (emphasis added) (noting that courts may consider "contacts that occurred *at least as far as a year* before the filing of the complaint . . . to establish the pattern of contacts that existed at the moment the complaint was filed."). Said activities demonstrate that Kraus engaged in substantial, continuous, and purposeful activity in New York within the meaning of §302(a)(1). See United Feature Syndicate, Inc., 216 F. Supp. 2d at 205-06 ("purposeful, periodic contacts with New York—taking many different forms over a period of years—clearly constitute" the transaction of business within the meaning of §302(a)(1)); *In re* Med-Atlantic Petroleum Corp., 233 B.R. 644, 657 (Bankr. S.D.N.Y. 1999) (non-domiciliary who regularly contacted a New York domiciliary regarding their fraudulent scheme, sent invoices from Greece to New York over a few years, and solicited the City of New York to enter into a contract was subject to a New York court's jurisdiction pursuant to §302(a)(1)); Grimaldi v. Guinn, 2010 N.Y. Slip. Op. 00926, 2010 WL 437447, at *11 (N.Y. App. Div. Feb. 9, 2010) (citations omitted) (finding that the non-domiciliary defendant transacted business per the meaning of §302(a)(1) when he solicited business over the internet and purposefully created an on-going relationship with the New York plaintiff).

2. *"Arising out of" Business Transacted in New York*

Accepting the above as true for the purposes of the present motion, Kraus' activities illustrate an elaborate, long-term scheme he developed to personally profit from the Marriage Policies. Said allegations are the basis for La Suisse's RICO claims

it asserts in its third-party complaint.  In sum, Kraus allegedly orchestrated a long-term scheme whereby he (1) convinced La Suisse to sell Marriage Policies in New York; (2) entered into an agreement with La Suisse to sell said policies in New York; (3) sold thousands of Marriage Policies in New York; (4) applied for and received loans from La Suisse to pay the annual premiums on the Marriage Policies; (5) collected the benefits of the Marriage Policies; and (6) brought lawsuits against La Suisse, in New York, in connection with the Marriage Policies.  Considering said activities, the Court finds that there is a substantial nexus between Kraus' transaction of business in New York and his alleged extortion; bribery; mail and wire fraud; threat and instigation of lawsuits; and breach of fiduciary duty.  See Pfizer Inc. v. Gilman, No. 01 Civ. 8419, 2002 WL 215653, at *5 (S.D.N.Y. Feb. 13, 2002) ("[P]laintiff[] need show only that the cause of action is sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business, and to subject the [third-party]defendants to suit in New York.").

    3.  Due Process

    In determining whether asserting personal jurisdiction meets due process requirements, the Court employs two tests: "minimum contacts" and "reasonableness." Bank Brussels Lambert, 305 F.3d at 127 (citation omitted).  Minimum contacts to justify personal jurisdiction exist when a plaintiff shows "that his [or her] claim arises out of or relates to [the] defendant's contacts with the forum state.  The plaintiff must also show that the defendant purposefully availed himself of the privilege of doing business in the forum state and that the defendant could foresee being haled into court there."  Pfizer

Inc., 2002 WL 215653, at *5 (internal quotation and citation omitted).  In determining the

reasonableness of the exercise of jurisdiction, the Court considers the following factors:

> (1) the burden that the exercise of jurisdiction will impose on the
> defendant; (2) the interests of the forum state in adjudicating the case; (3)
> the plaintiff's interest in obtaining convenient and effective relief; (4) the
> interstate judicial system's interest in obtaining the most efficient
> resolution of the controversy; and (5) the shared interest of the states in
> furthering substantive social politics.

Bank Brussels Lambert, 305 F.3d at 129 (citation omitted).  Where the party asserting

personal jurisdiction meets the requirements of the minimum contacts test, the party

opposing personal jurisdiction "must present 'a compelling case that the presence of

some other considerations would render jurisdiction unreasonable.'" Id. (citation

omitted).  The stronger the minimum contacts showing, the less weight is given to the

reasonableness inquiry.  Id.

As stated above, La Suisse sufficiently alleges that its RICO claim arises out of

Kraus' contacts with New York, and that Kraus purposely availed himself of the privilege

of doing business in New York.  Kraus could reasonably have foreseen being hailed to a

New York court because he solicited and carried out business contacts with New

Yorkers for a continuous period of years.  Moreover, requiring Kraus to defend this

action in New York is not burdensome because he has traveled to New York in the past

for the sales of, and litigation in connection with, the Marriage Policies.  In addition, it is

in New York's interest to see that this RICO action—which involves New York

residents—be heard and determined in New York.  Moreover, La Suisse would benefit

from the convenience in joining its third-party action with the main action filed in the

same court. It is also efficient to resolve this action in New York because La Suisse, in

16

defending itself in the main action, and the plaintiff Policyholders who will be witnesses, are located in New York.  Finally, New York has a substantive policy interest in insuring that its residents are not used as pawns to fabricate and perpetuate RICO activity.

C.  Forum Non-Conveniens

In the alternative, Kraus contends that dismissal is appropriate under the doctrine of *forum non conveniens*.  He submits that since La Suisse is a non-domiciliary of New York, New York is not a convenient forum.  Kraus also disregards La Suisse's RICO claims and asserts that Swiss law governs what he perceives as a breach of contract action.  In addition, he states that the witnesses reside in Europe.  Moreover, Kraus claims that since he and La Suisse have already litigated breach of contract claims in Switzerland, this case should be litigated there.  Finally, Kraus contends that New York jurors would be burdened by hearing this case.

In reviewing a motion to dismiss for *forum non conveniens*, the Court presumes "that the plaintiff's choice of forum will stand."  United Feature Syndicate, Inc., 216 F. Supp. 2d at 206 (citations omitted).  The Court grants greater deference to plaintiffs' choice of forum when plaintiffs sue in their home forum.  Id. (citation omitted).  Thus, defendants have a "heavy burden when arguing for dismissal based on *forum non conveniens*."  Id. at 207.  Defendants must make a:

> 'clear showing of facts which either (1) establish[es] such oppressiveness and vexation to [said defendants] as to be out of all proportion to plaintiff[s'] convenience, which may be shown to be slight or nonexistent, or (2) make[s] trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems.'

Id. (quoting Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947)).

In determining whether defendants meet their burden, courts consider a series of private and public interest factors.  Id. (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947)).  The private interest factors include:

> (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) issues concerning the enforceability of a judgment; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive—or the opposite.

Id. (citation omitted).  The public interest factors include:

> (1) the administrative difficulties flowing from court congestion; (2) the local interest in having controversies decided at home; (3) the interest in having a trial in a forum that is familiar with the law governing the action; (4) the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty.

Id. (citation omitted).

In consideration of the private and public factors listed above, Kraus failed to meet his heavy burden.  The Policyholders are witnesses to the alleged scheme Kraus created. They reside in New York.  Thus, they are more accessible, and their appearance is more economical, in a New York court.  In addition, evidence ascertained in connection with the main action will be in New York.  Moreover, New York has an interest in hearing La Suisse's RICO claims because New Yorkers are a part of the scheme.  Because RICO claims are the subject of La Suisse's action[7], there is no present issue regarding the application of foreign law or burdening New York jurors.

---

[7] The Court notes that La Suisse's breach of fiduciary duty claim *may* arise from an agreement whose terms are bound by Swiss law.  Nevertheless, two out of three of La Suisse's claims clearly arise from United States law.

18

For the foregoing, it is respectfully recommended that Kraus' motion to dismiss the third-party complaint on the grounds of lack of personal jurisdiction and *forum non conveniens* should be denied.

## III. CLASS ACTION

Plaintiff Policyholders seek to certify a class action pursuant to Rule 23 of the FRCP. The putative class consists of:

> All United States residents who are policyholders or assignees of endowment insurance policies with marriage-event clauses issued by Defendant La Suisse, Societe D'Assurances, Sur La Vie, a/k/a La Suisse, Lebens-Versicherungs-Gesell-Schaft, Lausanne a/k/a La Suisse Life Insurance Company, Lausanne ("La Suisse") from 1989 through 1995, inclusive (the "Class").

Pls.' Memo. of Law in Support of Class Certification at 1 [hereinafter "Memo in Support"]. Said putative Class is subdivided into five subclasses: (1) 3,500 policyholders who suffered an "Age Reduction" (La Suisse allegedly reduced amounts paid to the insured who married prior to their nineteenth birthdays rather than the allegedly contracted eighteenth birthday) and/or who did not receive a "Pro-rata Refund" (a monthly prorated rate on the annual premium if a premature marriage occurred); (2) 2,500 policyholders who allegedly "received contractually promised policy-loans from the defendant and suffered improper loan handling fees, exorbitant interest rates and backdating of loan contracts and suffered a wrongfully inflated deduction for settlement of the 'loan'", and were "also charged an exorbitant amount of Interest on Loans" ("Loan Claims"); (3) 560 policyholders who suffered a full premium deduction plus interest, which were not owed or due, when their Marriage Policies matured and La Suisse paid out the benefits ("Unowed Premium Deductions"); (4) 1,400 policyholders who were not

19

paid annual interest on dividend accounts from Marriage Policies which came in force before 1994, for a period up to 1995 when the Federal Office of Private Insurance granted La Suisse approval to suspend paying policyholders further annual dividends ("Interest on Dividend Accounts"); and (5) 60 policyholders, whose policies matured within two years of the policy term date, who did not receive their terminal bonus, plus another 300 policyholders whose policies had not matured at the time of the class action filing, but would be due the same terminal bonuses ("Terminal Bonuses").  Id. 6-9.

The proposed class representatives are New York residents who purchased Marriage Policies issued by La Suisse between 1989 and 1995.  Malka Moskowitz[8] ("Malka") received policy 1.086.313 from La Suisse.  She represents sub-classes one (1) and two (2).  Sarah Feuerwerger[9] ("Sarah") received policy 1.092.771 from La Suisse.  She represents sub-classes one (1), two (2), and three (3).  Berl Frankl ("Berl") is the insured under policy 1.098.752, issued by La Suisse.  She represents sub-classes two (2) and five (5).  Israel Fried ("Israel") is the policyholder of policy 1.109.091, issued by La Suisse.  He represents sub-classes one (1), two (2), and (3).  Joseph Moskowitz ("Joseph") is the beneficiary of policies 1.086.313 and 1.105.865, issued by La Suisse. He represents sub-classes one (1) and two (2).  Moshe Ekstein is the holder of policy 1.109.091.  He represents sub-classes one (1) and two (2).  Victor Frankl ("Victor") is the beneficiary of policies 1.090.190 and 1.105.305, issued by La Suisse.  He

---

[8]  Malka Moskowitz is Malka Moskovitz, Malka Rottenberg or Malka Moskovitz-Rottenberg.  In her deposition, her maiden name is spelled "Moskowitz."

[9] Sarah Feuerwerger is also called Sarah Feuerwerger-Friedman.

represents sub-classes two (2) and five (5).  All of the above-named class representatives allegedly suffered damages typical for the entire class, as well as the damages typical of the sub-classes they represent.

Plaintiffs' breach of contract claims arise from the Marriage Policies and loan agreements based on said policies.  Claims arising from the Marriage Policies are: (1) Age Reduction; (2) Pro-rata Refund; (3) Unowed Premium Deductions; (4) Interest on Dividend Accounts; (5)Terminal Bonuses; (6) improperly calculated late interest on premiums and twice-charged late interest, first calling it a "premium" and then "loan interest" (see Docket #101); and (7) wrongfully demanded, unnecessary documents to prove marriage prior to marriage claims being paid out (see Docket #101).  Claims arising from the loan agreements are the Loan Claims described above for sub-class two (2).

### A.  Class Certification

To be certified, the putative class must meet the four prerequisites of Rule 23(a) of the FRCP and show that the class may be maintained pursuant to one of the factors listed in Rule 23(b). Fed. R. Civ. Pro. 23(a)-(b); Brown v. Kelly, 244 F.R.D. 222, 227-28 (S.D.N.Y. 2007).  Plaintiffs bear the burden to establish the Rule 23 requirements by a preponderance of the evidence.  In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (citations omitted).

Rule 23(a) provides that:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable ["numerosity"]; (2) there are questions of law or fact common to the class ["commonality"]; (3) the claims or defenses of the representative parties are typical of the claims or

21

defenses of the class ["typicality"]; and (4) the representative parties will
fairly and adequately protect the interests of the class ["adequate
representation"].

Fed. R. Civ. Pro. 23(a); <u>Moore v. PaineWebber, Inc.</u>, 306 F.3d 1247, 1252 (2d Cir.

2002).

Rule 23(b)(3) ("predominance"), the factor by which plaintiffs claim their class

action is "maintainable", provides for a "maintainable" class action where "the court finds

that the questions of law or fact common to class members predominate over any

questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ.

Pro. 23(b)(3).  In determining whether common questions of law or fact predominate,

the court considers:

> (A) the class members' interests in individually controlling the prosecution
> or defense of separate actions; (B) the extent and nature of any litigation
> concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the
> claims in the particular forum; and (D) the likely difficulties in managing a
> class action.

Fed. R. Civ. Pro. 23(b)(3)(A)-(D).

When determining a motion for class certification pursuant to Rule 23 of the

FRCP, the Court must make "a ruling that each Rule 23 requirement is met."  <u>In re</u> Initial

<u>Pub. Offering Sec. Litig.</u>, 471 F.3d 24, 27 (2d Cir. 2006).  Such rulings "can be made

only if the judge resolves factual disputes relevant to each Rule 23 requirement . . . and

is persuaded to rule, based on the [established] relevant facts [to a particular Rule 23

requirement] and the applicable legal standard, that the requirement is met."  <u>Id.</u> at 41.

The Court must make such a determination even where there is an "overlap between a

Rule 23 requirement and a merits issue," or a merits issue is identical to a Rule 23 requirement. Id. In either instance, the Court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." Id. As such, the Court "has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits."[10] Id.

### 1. Numerosity

"To satisfy the numerosity requirement of Rule 23(a), plaintiffs must show that joinder is 'impracticable,' not that it is 'impossible.'" Presbyterian Church of Sudan v. Talisman Energy, Inc., 226 F.R.D. 456, 466 (S.D.N.Y. 2005) (citation omitted). Generally, when a putative class has forty or more members, numerosity is presumed. Id. Here, plaintiffs estimate that the total number of class members is 8,320. La Suisse does not dispute this number. As such, the proposed class satisfies the numerosity requirement. Brown v. Kelly, 244 F.R.D. at 229 (proposed classes consisted of thousands of people and "therefore easily satisf[ied] the numerosity requirement").

### 2. Adequate Representation

To determine whether the named plaintiffs will provide adequate representation to the class, the Court inquires whether plaintiffs': (1) "'interests are antagonistic to the interest of other members of the class,'" and (2) attorneys are qualified, experienced

---

[10] Regarding the numerous compendia, exhibits, and declarations submitted by the parties in connection with the motion for class certification, the Court accordingly limits its review of said documents to those which relate to the Rule 23 requirements.

and able to conduct the litigation.'" In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d at 35 (citation omitted). The goal of said inquiry is to determine whether conflicts of interest exist between the named parties and the unnamed class members. Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 176 (S.D.N.Y. 2008) (citation omitted). Additionally, the Court "consider[s] whether a putative representative is familiar with the action, whether he [or she] has abdicated control of the litigation to class counsel, and whether he [or she] is of sufficient moral character represent the class." Id. (citations and internal quotations omitted).

Moreover, the lead plaintiffs "must also possess 'a minimum threshold of knowledge about the case which, considering the nature of the claim, is sufficient to make reasonable decisions at critical stages of the litigation.'" Id. (citation omitted). Nevertheless, the Second Circuit disfavors attacking a class representative's adequacy on ignorance. In re Flag Telecom Holdings Sec. Litig., 574 F.3d at 42 (citing Baffa v. Donaldson, Lufkin & Jenrette Sec., 222 F.3d 52, 61 (2d Cir. 2000)). Thus, courts must apply this knowledge requirement "with a view toward typicality concerns" and conflicts of interest. Baffa, 222 F.3d at 61 (citation omitted).

Here, the Court concludes that the putative class representatives are inadequate to protect the interests of the class. Absent a deposition of Yisruel Goldstein, the record before the Court does not provide a basis for the Court to determine his adequacy, or whether he meets any other Rule 23 requirement. Regarding the remaining named plaintiffs, their lack of participation in the litigation and communication with the attorneys demonstrate that they have "so little knowledge of and involvement in the class action

24

that they would be unable . . . to protect the interests of the class against the possibly competing interests of the attorneys." Baffa, 222 F.3d at 61 (citation omitted).

Although this action was first filed in 2005, none of the named plaintiffs were aware of the litigation until shortly before their respective depositions in May and June of 2009.[11]  Decl. of Jason D. Minard, Ex. A, Malka Moskowitz Dep. at 22:7-15 [hereinafter "Malka Dep."]; Ex. B, Sarah Feuerwerger Dep. at 13:5-23 [hereinafter "Sarah Dep."]; Ex. C, Berl Frankl Dep. at 14:18-25; 15:2-14; 18:4-18 [hereinafter "Berl Dep."]; Ex. D, Victor Frankl Dep. at 11:24-12:3 [hereinafter "Victor Dep."]; Ex. E, Moshe Eckstein Dep. at 11:5-13 [hereinafter "Moshe Dep."]; Ex. F, Israel Fried Dep. at 109:11-15 [hereinafter "Israel Dep."]; and Ex. G, Joseph Moskowitz Dep. at 12:21-13:12; 18:23-19:5 [hereinafter "Joseph Dep."].  None of them are paying for an attorney or know the fee arrangement for the attorney.  Malka Dep. at 29:19-30:8; Sarah Dep. at 34:3-24; Berl Dep. at 33:9-11; Victor Dep. at 64:19-65:2; Moshe Dep. at 41:3-20; Israel Dep. at 12:3-13; 33:9-15; Joseph Dep. at 44:14-17; 45:5-13.

Malka, Sarah, Berl, and Victor did not authorize or ask an attorney to bring a lawsuit in their names.  Malka Dep. at 12:6-19; Sarah Dep. at 13:5-18; Berl Dep. at 27:4-13; Victor Dep. at 51:2-4.  Malka only spoke with an attorney once in connection with her deposition.  Malka Dep. at 29:14-18.  Sarah first spoke to an attorney three to four weeks prior to her deposition.  Sarah Dep. at 25:5-22.  Berl only spoke to an attorney twice: the day before and the day of his deposition.  Berl Dep. at 14:18-25; 18:4-18.  Moshe first spoke to an attorney one day before his deposition, and only

---

[11] Neither plaintiffs nor La Suisse submitted a deposition record of Yisruel Goldstein.

learned he had an attorney a few days before that.  Moshe Dep. at 22:12-23:20.  Israel first spoke to an attorney a couple of weeks before his deposition.  Israel Dep. at 32:14-16.  Joseph first spoke to an attorney a few days prior to his deposition.  Joseph Dep. at 18:23-19:5.

Sarah believes that she does not need to know everything about the litigation and has no familiarity with it other than what she learned at her deposition.  See Sarah Dep. at 21:21-22:5.  An attorney told Israel that he does not need to know everything about the lawsuit.  Israel Dep. at 6:12-20.  Neither Israel nor Joseph recognized the Class Action Complaint or the Amended Complaint.  Israel Dep. at 8:19-10:3; 13:6-14:10; Joseph Dep. at 12:21-13:12; 17-11-18:2.  Victor did not understand what the documents filed in the action meant, and his son, Berl, did not even know he had a Marriage Policy until four months prior to his deposition.  Victor Dep. at 35:24-39:17; Berl Dep. at 23:21-24:8.  Neither Moshe nor Victor know who makes decisions regarding the litigation.  Moshe Dep. at 34:21-35:2; Victor Dep. at 113:8-115:14.  Neither Moshe nor Joseph know the former or present filing attorneys.  Moshe Dep. at 13:11-17; 14:13-15:3; Joseph Dep. at 16:16-17:10; 17:11-18:19.

In addition, Sarah, Berl, Victor, and Moshe do not understand the responsibilities of a class representative.  Sarah Dep. at 28:8-10; Berl Dep. at 28:2-29:6; Victor Dep. at 60:3-14; Moshe Dep. at 25:11-21.  Moreover, Malka, Sarah, Berl, and Moshe do not know the details of their Marriage Policies or loan(s) to sufficiently describe or be aware of their claims, and thus whether said claims are typical to another class member. See Malka Dep. at 37:17-38:6; 43:17-44:2; Sarah Dep. at 50:24-51:3; 72:15-24; Berl Dep. at

23:12-25:22; Moshe Dep. at 26:15-27:11; 47:8-13.  Finally, Joseph does not know who decided to file a class action.  Joseph Dep. at 35:5-37:23.

This testimony demonstrates that the action was filed without plaintiffs' authorization and knowledge, they only learned of the lawsuit shortly before their respective depositions, and most do not know who is financing the litigation or who makes the decisions.  Their lack of knowledge of the litigation is not simply a matter of ignorance.  None of the plaintiffs stayed abreast of the litigation and there is a stark lack of substantive discussion with their attorneys.  See Baffa, 222 F.3d at 61-62.  As such, the plaintiffs are not adequate class representatives.  Cf. Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 177 (S.D.N.Y. 2008) (Court found plaintiff to be an adequate class representative because "he is familiar with the facts and legal theories underlying the case, is in regular contact with his lawyers, has met with them, has reviewed the complaint and other case documents, and understands that he is responsible for making decisions that impact the class and representing the class's best interest.").

### 3. Commonality, Typicality, and Predominance

The commonality requirement under Rule 23(a) states that the action must "raise an issue of law or fact that is common to the class."  Talisman Energy, 226 F.R.D. at 466.  "To establish typicality under Rule 23(a)(3), the party seeking certification must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d at 35 (citation omitted).  "The commonality and typicality requirements of Rule 23(a) tend to merge into one another, as both 'serve as guideposts for determining whether . . . the named plaintiff's claim and

27

the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'"  Talisman Energy, 226 F.R.D. at 466 (citations omitted).

Under Rule 23(b)(3), a class action is maintainable where class-wide issues predominate over individual issues.  Moore, 306 F.3d at 1252.  The predominance inquiry is more demanding than the commonality inquiry under Rule 23(a).  Id.  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  Id.  (citation omitted).  "[T]o determine whether common questions of law or fact predominate, a court must focus 'on the legal or factual questions that qualify each class member's case as a genuine controversy . . . [and] test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  Talisman Energy, 226 F.R.D. at 468 (alteration in the original) (citation omitted).  A defendant's course of conduct, driven by a single policy, "in a case with 'strong commonality of the violation and harm,'" is sufficient to establish predominance.  Id.  However, without commonality of violation and harm, a common course of conduct alone is insufficient to establish defendant's liability to any particular plaintiff.  Id.

Here, plaintiffs allege breach of contract claims against La Suisse.  To succeed on said claims, plaintiffs must prove that: "(1) a contract existed between the parties; (2) plaintiffs have in all respects complied with their obligations; (3) defendant's alleged failure constitutes a failure to perform its obligations under the contract; and (4) plaintiffs have been damaged as a result of the defendant's actions."  Weiss v. La Suisse, 226

F.R.D. 446, 451 (S.D.N.Y. 2005) (citations omitted).  The terms of the Marriage Policies are virtually identical and were sold through defendant's agents, brokers, and sub-brokers.  Thus, in this respect,  plaintiffs' claim has a common and typical issue.  See id. "Moreover, there are common issues that each plaintiff must prove in order to succeed on the breach of contract claim."  Id.

However, individual facts regarding the remaining elements of proof demonstrate that plaintiffs have not met the commonality and typicality requirements.  For example, "each class member must prove that he has in all respects complied with his obligations under the contract."  Id.  In addition, each "class member must demonstrate the manner in which La Suisse allegedly failed to live up to its obligations."  Id.   Correspondingly, the Court will have to make individual assessments of each claim to determine whether said claims are barred by the relevant statute of limitations.  Proof of damages is also highly individualized.  Id.

In addition, Malka, Sarah, Berl, and Moshe do not know enough about their claims to show that they are typical class members.  See Malka Dep. at 37:17-38:6; 43:17-44:2; Sarah Dep. at 50:24-51:3; 72:15-24; Berl Dep. at 23:12-25:22; Moshe Dep. at 26:15-27:11; 47:8-13.  Further, Victor believes that the claims he asserts in connection with Berl's Marriage Policy differ from anyone else's claims.  Victor Dep. at 53:11-19; 54:7-14.

Thus, even though plaintiffs contend that La Suisse carried out a common course of conduct, without individualized assessments of who breached first, when, and how, and where five of the seven plaintiffs cannot demonstrate typicality, plaintiffs failed to demonstrate commonality of violation and harm.  See Talisman Energy, 226 F.R.D. at

29

468.  Furthermore, Victor and Berl (by virtue that one policy affects both of them);

Joseph and Malka (by virtue that one policy affects both of them), and Israel understood

the terms of their Marriage Policies, and thus base their claims, on oral representations

made by their brokers, rather than by written materials produced by La Suisse.  Victor

Dep. at 83:16-84:2; 106:25-108:16; Joseph Dep. at 56:15-58:11; 67:3-15; Israel Dep. at

45:17-24; 46:10-22.  Said plaintiffs do not allege facts demonstrating that the oral

representations made by their brokers "were materially uniform," therefore they do not

successfully allege "generalized rather than individualized proof."  Moore, 306 F.3d at

1249, 1255-56.  As such, individual claims predominate, precluding class certification.

Id. at 1256.

The Court also notes that plaintiffs here fail to distinguish their putative class from

the putative class in Weiss.  Compare Memo in Support at 1 and Weiss, 226 F.R.D. at

449.  Plaintiffs do not exclude the named plaintiffs in Weiss, whose claims have been

adjudicated outside of a class action.  As such, plaintiffs further fail to demonstrate that

a class action is superior to other available methods for fairly and efficiently adjudicating

the controversy

Accordingly, it is respectfully recommended that class certification should also be

denied because plaintiffs failed to meet the commonality, typicality, and predominance

requirements.

### B. Res Judicata

Because the Court determines that plaintiffs failed to prove the requirements of

Rule 23, it declines to reach the issue of res judicata.

## IV.  CONCLUSION

For all of the foregoing reasons, I conclude, and respectfully recommend, that (1) third-party defendant Kraus' motion to dismiss should be DENIED as to his lack of personal jurisdiction and *forum non conveniens* claims; and (2) the Policyholder's motion for class certification should be DENIED.

## V.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(C), as amended, and Rule 72(b), Fed. R. Civ. P., the parties shall have fourteen (14) days from receipt of this Report  to serve and file written objections to this Report and Recommendation.  If copies of this Report are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of this Report to file and serve written objections.  See Fed. R. Civ. P. 6(d).  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Stephen C. Robinson at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to the Honorable Stephen C. Robinson and not to the undersigned.

Dated:  March  _____, 2010          Respectfully Submitted:

        White Plains, New York

31

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to the Honorable Stephen C. Robinson and not to the undersigned.


Dated:   March  $\underline{31}$ , 2010          Respectfully Submitted:

White Plains, New York


_____

GEORGE A. YANTHIS, U.S.M.J.

32