UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LA SUISSE, SOCIETE D'ASSURANCES          :
SUR LA VIE, n/k/a  SWISS LIFE AG
                                         :

             Third-party plaintiff,      :    06 Civ. 4404 (CM) (GWG)
                                         :    AMENDED REPORT AND
      -against-                               RECOMMENDATION
                                         :

MOSES KRAUS AND CARUSO AG,               :

             Third-party defendants.     :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        On December 13, 2013, Judge Colleen McMahon entered a default judgment and

permanent injunction against third-party defendants Moses Kraus and Caruso AG and in favor of

third-party plaintiff Swiss Life AG.  The case was referred to the undersigned for an inquest on

damages.  On June 27, 2014, this Court issued a Report and Recommendation addressing Swiss

Life's request for damages.  Having considered Swiss Life's objection to that Report and

Recommendation, and additional materials filed with that objection, this Court hereby vacates

the prior Report and Recommendation, La Suisse, Societe D'Assurances Sur La Vie v. Kraus,

2014 WL 2916435, 2014 U.S. Dist. LEXIS 88487 (S.D.N.Y. June 27, 2014), and replaces it with

this Amended Report and Recommendation.

        For the reasons stated below, Swiss Life AG should be awarded damages in the amount

of $8,433,027 plus 136,198,568.55 Swiss Francs ("CHF"), with the latter figure to be converted

by the Clerk of Court to United States dollars on the date judgment is entered.

I. <u>BACKGROUND</u>

We summarize this litigation only to the extent necessary to explain the basis for the inquest.

Swiss Life AG, formerly known as La Suisse Societe D'Assurances Sur La Vie ("La Suisse"), was named as the defendant in the underlying lawsuit and eventually filed a third-party complaint against Moses Kraus and Caruso AG.  <u>See</u> Third-Party Complaint, filed March 17, 2008 (Docket # 22) ("TPC").[1]  The original complaint has been dismissed.  <u>See</u> Order Dismissing Action with Prejudice and Directing Return of Funds Posted with the Court, dated Feb. 3, 2014 (Docket # 196).  In the third-party complaint, Swiss Life alleges that Kraus and Caruso controlled an enterprise that defrauded Swiss Life and later initiated lawsuits against Swiss Life in the names of Swiss Life policyholders in the courts of the United States, Switzerland, and Israel, with the aim of extorting Swiss Life to make payments directly to Kraus and Caruso.  TPC ¶¶ 23-65, 69-78, 84-90.  Swiss Life seeks damages and injunctive relief for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, <u>et. seq.</u>, and for breach of fiduciary duty.  <u>See</u>, <u>e.g.</u>, TPC ¶¶ 4-6.

Swiss Life's third-party complaint asserts that Kraus and Caruso violated RICO in two respects.  First, Kraus and Caruso are alleged to have intentionally misrepresented vital demographic information regarding the population to which they were selling insurance policies underwritten by La Suisse, resulting in financial gain to Kraus and Caruso and financial loss to La Suisse.  TPC ¶ 7.  Second, Kraus and Caruso are alleged to have initiated and financed the instant lawsuit which, while purportedly commenced for the benefit of policyholders, was

---

[1]  We use the names "Swiss Life" and "La Suisse" as they are used in third-party plaintiff Swiss Life's third-party complaint and inquest submissions.

allegedly in fact a tool to extort money from La Suisse.  TPC ¶ 8.  Kraus and Caruso are also

alleged to have brought or threatened to bring additional lawsuits against La Suisse if they were

not compensated.  Id.

On December 13, 2013, Judge McMahon entered a default judgment against Kraus and

Caruso based upon their failure to answer the third-party complaint.  See Default Judgment,

dated Dec. 13, 2013 (Docket # 193) ("Default Judgment").  The default judgment states the

following:

> (1) Kraus and Caruso participated in a racketeering scheme under 18 U.S.C.
> § 1962(c) through their repeated violation of the U.S. criminal statutes on
> extortion (18 U.S.C. § 1951), mail (18 U.S.C. § 1341) and wire (18 U.S.C.
> § 1343) fraud, and bribery (18 U.S.C. § 201), all predicate acts under 18 U.S.C.
> § 1961 et seq., the Racketeer Influenced and Corrupt Organizations Act
> ("RICO").  Swiss Life is entitled to treble damages as well as injunctive relief
> pursuant to 18 U.S.C. § 1964(a) and (c).
>
> (2) Kraus and Caruso, and any sub-broker under their control, owed a duty to
> Swiss Life to properly explain and not misrepresent the terms of the Swiss Life
> insurance policies, commonly referred to as marriage policies, at the heart of the
> lawsuit titled Moskovitz v. La Suisse, 06 Civ. 4404.  To the extent Kraus and
> Caruso, and any sub-broker under their control, intentionally misrepresented,
> exaggerated or failed to explain the policy terms to certain policyholders, Swiss
> Life is entitled to indemnification from Kraus and Caruso for any harm arising
> out of those failures.

Default Judgment at 2.  The default judgment contains injunctive relief against Kraus and Caruso

pursuant to 18 U.S.C. § 1964(a) and provides that Swiss Life is to be awarded monetary

damages against Kraus and Caruso on a joint and several basis.  Id. at 3.  It states that Swiss Life

is entitled to treble damages pursuant to 18 U.S.C. § 1964(c).  Id.  Finally, the default judgment

awards to Swiss Life attorney's fees in the amount of $1,369,718.50, and costs and

disbursements in the amount of $201,884.61, pursuant to 18 U.S.C. § 1964(c).  Id.

On February 10, 2014, Judge McMahon referred this matter to the undersigned to

conduct an inquest.  See Order, dated Feb. 10, 2014 (Docket # 197).  On February 11, 2014, this

Court issued an order directing Swiss Life to submit proposed findings of fact and conclusions of

law with supporting documentation as to its request for damages.  See Scheduling Order for

Damages Inquest, dated Feb. 11, 2014 (Docket # 198).  Swiss Life submitted proposed findings

of fact and conclusions of law, supporting affidavits, and other materials.[2]

Under the Court's order, Kraus and Caruso were given until April 28, 2014, to oppose

Swiss Life's submissions.  Id. ¶ 2.  The Order also notified the parties that the Court would

conduct the inquest based upon the written submissions of the parties unless a party sought an

evidentiary hearing.  Id. ¶ 3.  A copy of the Order was mailed to Kraus and Caruso at their last

known addresses.

Because the default judgment entered in this case establishes the liability of Kraus and

Caruso, see Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995) (citation

omitted), the "only issue remaining is whether [Swiss Life has] supplied adequate support for the

damages [it] seek[s]," Kuruwa v. Meyers, 823 F. Supp. 2d 253, 256 (S.D.N.Y. 2011), aff'd 512

F. App'x 45 (2d Cir. 2013); accord GAKM Res. LLC v. Jaylyn Sales Inc., 2009 WL 2150891, at

---

[2]  See Proposed Findings of Fact and Conclusions of Law, dated March 28, 2014 (Docket # 200); Declaration of Jesse T. Conan, dated March 28, 2014 (Docket # 201); Attorney Time Records (undated) (filed under seal) ("Time Records").  Along with these submissions, Swiss Life also provided two affidavit that it had originally filed in connection with its motion for a default judgment.  See Declaration of Philippe Pointet, dated Dec. 20, 2012 (Docket # 171) ("Pointet Decl."); Declaration of Richard N. Chassin, dated Dec. 12, 2012 (Docket # 172) ("Chassin Decl.").   After this Court issued the original Report and Recommendation, Swiss Life filed an objection and an affidavit that contained additional factual material.  See Swiss Life's Rule 72 Objection to the Report and Recommendation of Magistrate Gabriel W. Gorenstein, dated July 11, 2014 (Docket # 207) ("Objection"); Declaration of Jesse T. Conan, dated July 11, 2014 (Docket # 208) ("Conan Objection Decl.").

*2 (S.D.N.Y. July 20, 2009) ("A default judgment that is entered on the well-pleaded allegations in a complaint establishes a defendant's liability . . . and the sole issue that remains before the court is whether the plaintiff has provided adequate support for the relief it seeks.") (citations omitted).  The Second Circuit has held that an inquest into damages may be held on the basis of documentary evidence alone "as long as [the court has] ensured that there was a basis for the damages specified in [the] default judgment."  Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989); accord Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991).

None of the parties have requested an evidentiary hearing, and neither Kraus nor Caruso have made any submission to the Court.  Because Swiss Life's submissions provide a basis for an award of damages, no hearing is required.

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

In light of the default of Kraus and Caruso, Swiss Life's properly-pleaded allegations, except those related to damages, are accepted as true.  See, e.g., City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint.") (citing Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004)); Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) ("In light of [defendant's] default, a court is required to accept all . . . factual allegations as true and draw all reasonable inferences in [plaintiff's] favor.") (citation omitted).  The following findings of fact and conclusions of law are based on the allegations in Swiss Life's third-party complaint regarding liability and the admissible evidence regarding damages contained in its inquest submissions.

### A.  Facts Relating to Liability

5

Swiss Life is an insurance company organized under the laws of Switzerland with its principal place of business in Zurich, Switzerland.  TPC ¶ 10.  Swiss Life merged with La Suisse in November 2005, and La Suisse no longer exists as a separate corporate entity.  Id. ¶ 11.  Caruso is a European brokerage firm organized under the laws of Liechtenstein with its principal place of business in London, England.  Id. ¶ 12.  Kraus is a resident of England and an insurance broker affiliated with Caruso.  Id. ¶¶ 14-15.  Kraus and Caruso acted as insurance brokers for La Suisse and, as such, sold and marketed the insurance policies that were the subject of the instant litigation.  Id. ¶ 3.

### 1.  Fraud in Relation to Sale of Insurance Policies

The insurance policies involved in this case are endowment policies known as "marriage policies."  Id. ¶ 23.  They call for the payment of the face value of the policy when the insured person reaches age 26, dies, or marries, whichever happens first.  Id.  Insurance brokers from the Chassidic Jewish community in New York and elsewhere conceived a plan to market and sell these policies in the late 1980's.  Id. ¶ 24.  La Suisse entered into agreements with various brokers, including Kraus and Caruso, that allowed the brokers to sell the policies in New York.  Id. ¶¶ 26-27.  The agreements provided that the brokers would earn commissions on the sale of each policy, and they further specified that the brokers owed duties of good faith, honesty, and loyalty to La Suisse.  Id. ¶ 28.

In setting the price of premiums for the policies, La Suisse used statistics concerning the marriage rates and ages of the Swiss population.  Id. ¶ 29.  The brokers informed La Suisse that they planned to market the policies to the Jewish population at large.  Id. ¶ 30.  The marriage rates and marriage ages of the Jewish population are consistent with the statistics of the marriage rates and marriage ages of the Swiss population.  Id. ¶ 31.  The marriage rates and ages of the

Chassidic community, however, are significantly different from those of the Swiss or Jewish populations generally, and the brokers knew that the average marriage age of members of the Chassidic community is approximately 19 years of age, far lower than that of the Swiss or Jewish populations generally.  Id. ¶ 32.  Unbeknownst to La Suisse, the brokers planned to sell the policies almost exclusively to members of the Chassidic community.  Id. ¶ 25.  As a consequence of the brokers' misrepresentations regarding the probable marriage ages and rates of the policyholders, the policyholders systematically gained unusually high returns because the insured persons would marry at ages far lower than the statistical assumptions La Suisse had used to set premiums.  Id. ¶ 33.  On average, each policyholder paid approximately five fewer annual premiums than La Suisse expected when it priced the policies but still received the full face value of the policy upon marriage.  Id. ¶ 34.  La Suisse relied on the brokers' misrepresentations when setting the terms of the policies, including the price of the premiums.  Id. ¶ 39.  The brokers sold approximately 7,000 policies to residents of New York.  Id. ¶ 35.  La Suisse uncovered this fraudulent conduct in 1995 and immediately ceased all sales of new policies.  Id. ¶ 36.  It continued paying benefits on existing ones, however.  Id.

To prevent La Suisse from revising the terms of its policies, the brokers, including Kraus and Caruso, repeatedly misrepresented the population to which they were marketing and selling the policies.  Id. ¶ 41.  These misrepresentations occurred during the period between 1989 and 1995.  Id. ¶ 40.  For example, in a telephone conversation in September 1990, Kraus represented to Gerhard Mayer of La Suisse that most marriages would occur between the ages of 22 and 24, even though Kraus knew this representation was false.  Id. ¶¶ 42-43.  La Suisse relied on this misrepresentation to its detriment.  Id. ¶ 44.  On October 10, 1990, Kraus told La Suisse that the company should not be concerned about the possibility that large numbers of policyholders

7

would marry earlier than its assumptions indicated, even though Kraus knew this representation was false.  Id. ¶¶ 45-46.  La Suisse relied on this misrepresentation to its detriment.  Id. ¶ 47.  On or about May 15, 1995, Kraus forwarded to La Suisse a letter he received from the Council of Jewish Federations, dated May 15, 1995, which contained statistics stating that the average age of first marriage for Jewish men is 29 and the average age of first marriage for Jewish women is 26.  Id. ¶ 48.  Kraus knew that sending this letter to La Suisse would persuade La Suisse that it had correctly relied on statistics for the marriage ages and rates of the Swiss population, as they were consistent with the statistics contained in the letter from the Council of Jewish Federations.  Id. ¶ 49.  La Suisse believed that the letter and the statistics it contained supported its reliance on statistics for the marriage ages and rates of the Swiss population, as they were consistent with the statistics provided by the Council of Jewish Federations.  Id. ¶ 50.

Part or all of the payment of premiums due on the policies was financed by the brokers or companies controlled by the brokers.  Id. ¶ 66.  The brokers, including Kraus and Caruso, paid the premiums on behalf of policyholders in exchange for the right to collect the benefits, but the brokers never informed La Suisse that, in many cases, the brokers were the true parties of interest.  Id. ¶ 67.

### 2. Extortionate Litigation and Associated Bribery

The brokers also attempted to extort La Suisse and Swiss Life by using the threat of litigation and actual litigation.  Id. ¶ 69.  In 1997, non-defendant broker Elias Horowitz initiated and financed the first in a series of policyholder lawsuits in New York against La Suisse in the case of Kalman Weiss v. La Suisse, 97 Civ. 1352.  Id. ¶ 70.  In Kalman Weiss, the policyholders asserted claims for breach of contract and discrimination under 42 U.S.C. § 1981.  Id.  Horowitz also caused another action in New York to be brought against Swiss Life under the name of Isac

Hirsch v. La Suisse, 04 Civ. 10251.  Id. ¶ 71.  At a meeting with La Suisse executives on or about February 28, 2001, Kraus offered to provide favorable testimony for the company in Kalman Weiss if he were compensated.  Id. ¶ 72.  Kraus advised La Suisse executives that he could influence the jury in the case depending on how he chose to testify, and he also told the executives that he had documents in his possession which could similarly sway the jury.  Id.  La Suisse ignored Kraus's offers and refused to compensate him.  Id.  Kraus planned to testify for the plaintiffs in Kalman Weiss but was disqualified because plaintiffs had not properly identified him as a witness in the pretrial order.  Id. ¶ 73.  Other than several small awards based on misdirected payments, La Suisse prevailed in Kalman Weiss.  Id. ¶ 74.

     In 2005, Kraus and Caruso filed the instant action ("Moskovitz"), purportedly on behalf of policyholders.  Id. ¶ 75.  Kraus and Caruso paid all legal fees in Moskovitz and otherwise controlled the litigation.  Id.  Kraus and Caruso have also initiated approximately 50 lawsuits in Switzerland and Israel against La Suisse and Swiss Life and have engaged in a calculated effort to use these lawsuits to force Swiss Life to make payments directly to them.  Id. ¶¶ 76-77.  Such efforts included threats to file more lawsuits unless Kraus and Caruso were paid money, as well as promises to settle lawsuits if they were paid.  Id. ¶¶ 78(a)-78(g).

   B.  Damages

     RICO provides that it is unlawful for any person "employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  There are three elements to a civil RICO claim: (1) a substantive violation of 18 U.S.C. § 1962; (2) injury to plaintiff's business or property; and (3) causation of the injury by reason of the violation.  See, e.g., UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 131

(2d Cir. 2010); accord Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc., 2014 WL

1801139, at *9 (E.D.N.Y. May 7, 2014).  Also, "in order to prevail on a civil RICO claim

predicated on any type of fraud . . . the plaintiff must establish 'reasonable reliance' on the

defendants' purported misrepresentations or omissions."  Bank of China, N.Y. Branch v. NBM

LLC, 359 F.3d 171, 178 (2d Cir. 2004).

    The terms of the default judgment entered by Judge McMahon explicitly provide that

Kraus and Caruso "participated in a racketeering scheme under 18 U.S.C. § 1962(c)" through the

predicate acts of extortion, mail fraud, wire fraud, and bribery, and that "Swiss Life is entitled to

treble damages . . . pursuant to 18 U.S.C. § 1964(a) and (c)."  Default Judgment at 2.  In light of

the issues resolved by the default judgment itself, we will consider only whether Swiss Life's

submissions adequately demonstrate that Kraus and Caruso's RICO violations caused the

damages it alleges.[3]

    Accordingly, we begin our analysis by noting that "a RICO plaintiff is required to show

that the RICO violation not only was a 'but for' cause of his injury, but was also the proximate

cause as well."  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 464 (2006) (citing Holmes v.

Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992)) (internal quotation marks omitted);

accord Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 9 (2010) ("[T]he plaintiff is

required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but

was the proximate cause as well.") (citation and internal quotation marks omitted).  As the

Second Circuit has explained:

---

    [3] Swiss Life has satisfied the reliance element, as the third-party complaint alleges that
"La Suisse relied on the Brokers' misrepresentations . . . when setting the terms of the Marriage
Policies, including the price of the premiums."  TPC ¶ 39.

> To show injury by reason of a RICO violation, a plaintiff must demonstrate that
> the violation caused his injury in two senses.  First, he must show that the RICO
> violation was the proximate cause of his injury, meaning "there was a direct
> relationship between the plaintiff's injury and the defendant's injurious conduct."
> First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994).
> Second, he must show that the RICO violation was the but-for (or transactional)
> cause of his injury, meaning that but for the RICO violation, he would not have
> been injured.  See Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992).

UFCW Local 1776, 620 F.3d at 132.  Proximate cause requires "some direct relation between the

injury asserted and the injurious conduct alleged," and thus, a "link that is too remote, purely

contingent, or indirect is insufficient."  Hemi Grp., 559 U.S. at 9 (citations and quotation marks

omitted).

Here, the third-party complaint alleges that, but for Kraus and Caruso's

misrepresentations concerning the average marriage ages of the population they intended to

target, La Suisse would not have sold the policies as written.  See TPC ¶¶ 29-36.  The predicate

acts of fraud also proximately caused Swiss Life's injury inasmuch as the third-party complaint

alleges that Kraus and Caruso actively persuaded Swiss Life not to alter the terms of the

marriage policies by repeatedly misrepresenting the population to which they were marketing

and selling the policies, thus establishing that Kraus and Caruso's fraud was a direct cause of

Swiss Life's injury.  See id. ¶¶ 40-41.

1. Damages from Kraus and Caruso's Fraud

Swiss Life seeks to recover "damages suffered by Swiss Life arising out of the sale of the

Marriage Policies in the United States brokered by Kraus and Caruso."  Proposed Findings of

Fact and Conclusions of Law ¶ 35.  To calculate these damages, Swiss Life notes that "[l]ife

insurance companies, such as Swiss Life, collect premiums from policyholders and pay benefits

to those policyholders upon the occurrence of specified events – the 'insured event.'"  Pointet

Decl. ¶ 4.  "As a general matter, life insurance companies set the price of annual premiums so that they collect sufficient funds to pay benefits and cover costs."  Id.  Because insurers "receive premiums up front and pay claims later," they are able to invest the money they hold for their own benefit.  Proposed Findings of Fact and Conclusions of Law ¶ 24.  Under the terms of the marriage policies at issue in this case, marriage was an insurable event.  Pointet Decl. ¶ 5. However, as a result of the fraud described above, Swiss Life collected approximately five fewer premium payments per policy than it had expected.  Id. ¶ 6.  The average annual premium paid by the policyholders was approximately CHF 6,000, meaning that Swiss Life lost, on average, approximately CHF 30,000 per policy.  Id.  Swiss Life had sold approximately 10,000 marriage policies worldwide.  Id.

In 2006, Swiss Life engaged PriceWaterHouseCoopers ("PWC") to assess the losses suffered by the company from these marriage policies.  Id. ¶ 7.  PWC's analysis established that, as of December 31, 2006, Swiss Life had paid CHF 749,471,889 in benefits to policyholders of the marriage policies.  Id. ¶ 9; Financial Data Chart (annexed as Ex. B to Pointet Decl.).  As of that date, the cumulated reserves available to satisfy the benefits were CHF 471,674,169. Pointet Decl. ¶ 9; Financial Data Chart.  Thus, PWC determined that Swiss Life's losses were CHF 277,797,720 as of December 31, 2006.  Pointet Decl. ¶ 9; Financial Data Chart.  Between December 31, 2006, and June 30, 2012, Swiss Life accumulated additional losses of CHF 10,556,442.  See Financial Data Chart; Pointet Decl. ¶ 11.  Thus, as of June 30, 2012, Swiss Life's actual losses on the entire portfolio of marriage policies were CHF 288,354,162.  Pointet Decl. ¶ 11.

Swiss Life's records establish that Kraus and Caruso acted as broker for 28% of all of the marriage policies sold worldwide, with 50% of these policies having been sold to policyholders

in the United States and 50% having been sold to policyholders living outside the United States. Id. ¶ 14.  Therefore, Swiss Life concludes that losses arising out of the marriage policies are 14% of the worldwide losses.  Because Swiss Life has (inexplicably) rounded down the worldwide losses to CHF 288,000,000, Swiss Life calculates the losses on the policies brokered by Kraus and Caruso in the United States to be CHF 40,320,000 (i.e., 14% of the rounded-down worldwide loss figure).  Id. ¶ 15.  Kraus and Caruso also received a total of CHF 10,159,045.70 in commissions from their sale of marriage policies.  Id. ¶ 16.  Because 50% of those policies were sold in the United States, commissions paid to Kraus and Caruso for their sale of marriage policies in the United States total CHF 5,079,522.85.  Id. ¶ 17.  As a result, Swiss Life concludes that the damages it suffered arising out of the sale of the marriage policies in the United States brokered by Kraus and Caruso are CHF 45,399,522.85.  Id. ¶ 18; Proposed Findings of Fact and Conclusions of Law ¶ 35.

The Court finds this methodology for calculating damages attributable to Kraus and Caruso to be reasonable, particularly given that neither Kraus nor Caruso have proposed any other manner of calculating damages.  See, e.g., U.S.A. Famous Original Ray's Licensing Corp. v. Famous Ray's Pizza Buffet Inc., 2013 WL 5363777, at *5 (S.D.N.Y. Sept. 26, 2013) (resolving doubts in damages calculations against defaulting defendant).  Case law requires that a party need only establish the amount of damages at an inquest with "reasonable" certainty. See, e.g., RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l., 2013 WL 1668206, at *6 (S.D.N.Y. April 18, 2013) (citing cases).  While Swiss Life's model is based on its total losses, it does not seek damages for money lost on policies untainted by Kraus and Caruso's fraud. Instead, it determines loss attributable to the policies Swiss Life issued at the behest of Kraus and Caruso.

13

Accordingly, we find that Swiss Life suffered losses of CHF 45,399,522.85 as a result of Kraus and Caruso's fraudulent conduct.

### 2.  Damages from Extortionate Litigation

Swiss Life also seeks damages for expenses incurred in defending against the Moskovitz litigation, the pursuit of which, in part, constituted the RICO predicate act of extortion under the default judgment.  For this aspect of its claim, Swiss Life seeks damages in the amount of $2,811,009.  See Proposed Findings of Fact and Conclusions of Law ¶ 46.  Although Moskovitz was filed on June 2, 2005, Swiss Life asserts that "the case demands and associated extortionate pressure began to increase dramatically starting in January 2006."  Id. ¶ 42 (citing Chassin Decl. ¶ 4).  Thus, Swiss Life seeks only those fees "incurred . . . from January 1, 2006, to November 30, 2012, just before Swiss Life filed its motion for a default judgment."  Id.

The Hobbs Act, 18 U.S.C. § 1951, defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  Id. § 1951(b)(2).  In order to make out a claim of extortion in violation of the Hobbs Act, a plaintiff must prove that a defendant "(1) induced [the victim], with [the victim's] consent, to part with property, (2) through the wrongful use of actual or threatened force, violence or fear (including fear of economic loss), (3) in such a way as to adversely effect interstate commerce."  McLaughlin v. Anderson, 962 F.2d 187, 194 (2d Cir. 1992) (citations omitted); accord Ascentive, LLC v. Opinion Corp., 842 F. Supp. 2d 450, 478 (E.D.N.Y. 2011).  The element of fear required under the Hobbs Act may be satisfied by "putting the victim in fear of economic loss."  United States v. Capo, 817 F.2d 947, 951 (2d Cir. 1987) (citation omitted).  The victim must "reasonably believe[]" that the defendant "had the power to harm the victim" and also that "the defendant would exploit that power to the victim's

14

detriment." United States v. Middlemiss, 217 F.3d 112, 118 (2d Cir. 2000) (citations omitted).

"[L]egal fees may constitute RICO damages when they are proximately caused by a RICO

violation." Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1167 (2d Cir. 1993)

(citation omitted); accord Angermeir v. Cohen, 2014 WL 1613016, at *13 (S.D.N.Y. March 27,

2014) (collecting cases).  Because the Hobbs Act also forbids attempted extortion, an

extortionate effort need not be successful in order to be actionable.  See McLaughlin, 962 F.2d at

194 (citing 18 U.S.C. § 1951(a)).  However, "a threat to cause economic loss is not inherently

wrongful; it becomes wrongful only when it is used to obtain property to which the threatener is

not entitled." United States v. Jackson, 180 F.3d 55, 70 (2d Cir. 1999); accord Kashelkar v.

Rubin & Rothman, 97 F. Supp. 2d 383, 392 (S.D.N.Y. 2000) (no claim for extortion lies "when

the Defendant had a good faith claim of right to the money sought") (citations omitted);

Calabrese v. CSC Holdings, Inc., 283 F. Supp. 2d 797, 809 (E.D.N.Y. 2003) ("[T]he use of

economic threats to obtain property is wrongful only if the defendant does not have a claim of

right to that property.") (citations omitted); United States v. Sturm, 870 F.2d 769, 773 (1st Cir.

1989) ("[T]he use of legitimate economic threats to obtain property is wrongful only if the

defendant has no claim of right to that property.").

Notwithstanding these principles, courts are nearly unanimous in the view that the pursuit

of frivolous litigation does not constitute the predicate RICO act of extortion.  See, e.g., Deck v.

Engineered Laminates, 349 F.3d 1253, 1258 (10th Cir. 2003) ("[W]e join a multitude of other

courts in holding that meritless litigation is not extortion under [18 U.S.C.] § 1951.");

FindTheBest.com, Inc. v. Lumen View Tech. LLC, 2014 WL 2050610, at *4 (S.D.N.Y. May 19,

2014) ("The courts of appeals which have addressed the question have all agreed that the

instigation of meritless litigation does not establish the predicate RICO act of extortion.") (citing

15

cases); id. ("[W]hile the Second Circuit has not yet addressed the question, district courts in this circuit have held that the filing of meritless litigation, or even malicious prosecution, is not a predicate RICO act.") (citing cases); E. Savings Bank, FSB v. Papageorge, 2014 WL 910357, at *5 (D.D.C. March 10, 2014) ("Abusive or sham litigation does not constitute a RICO predicate act.") (citing cases); but see Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick, 726 F. Supp. 1083, 1093–97 (E.D. Mich. 1989) (lawsuit was component of extortion).  As the Tenth Circuit pointed out in Deck, "[t]o promote social stability, we encourage resort to the courts rather than resort to force and violence" and "[e]xtortion is the antithesis of litigation as a means of resolving disputes."  349 F.3d at 1258.  As a result, "recognizing abusive litigation as a form of extortion would subject almost any unsuccessful lawsuit to a colorable extortion (and often a RICO) claim."  Id.  In other words, "[w]henever an adverse verdict results from failure of the factfinder to believe some evidence presented by the plaintiff, the adverse party could contend that the plaintiff engaged in extortionate litigation."  Id.; accord FindTheBest.com, 2014 WL 2050610, at *14 ("Recognizing [meritless] litigation as a predicate RICO act would give complainants unprecedented access to federal courts and the treble damage remedy authorized under RICO" and "allowing these suits to proceed as RICO suits risks chilling parties' resort to the judicial system to resolve their disputes.").

Swiss Life, however, urges that these cases are inapposite because this case does not involve a "trumped-up complaint about frivolous litigation."  Objection at 4.  In their view, Moskowitz and the other lawsuits are different in kind because they "have no nexus to Kraus or the personal payment demanded by him to make them go away."  Id.  Indeed, case law recognizes that litigation may constitute extortion where the "victim of the extortionate activity had a preexisting right to be free from the threats invoked."  United States v. Tobin, 155 F.3d

636, 640 (3d Cir. 1998).  In <u>Tobin</u>, involving a criminal violation of the Hobbs Act, the

defendant's threat to sue was considered extortionate where the defendant "did not threaten to

pursue legal action" to enforce an alleged oral contract but rather "threatened unrelated lawsuits

alleging sexual harassment."  <u>Id.</u>  Here, Swiss Life points out that the policyholder lawsuits

"initiated and controlled by Kraus and Caruso could not resolve a dispute between Kraus/Caruso

and Swiss Life."  Objection at 4 n.4.

 We agree.  The lawsuits controlled by Kraus and Caruso constituted extortion for RICO

purposes because Kraus and Caruso did not have a legitimate claim of right to the proceeds of

the <u>Moskovitz</u> lawsuit.  Rather, the allegations of the third-party complaint, deemed admitted by

virtue of Kraus and Caruso's default, establish that "Kraus and Caruso have attempted to

leverage their control and influence over the policyholders by instituting policyholder litigations

against Swiss Life, such as <u>Moskovitz</u>, and otherwise threatening Swiss Life in an attempt to

extort Swiss Life into making payments directly to Kraus and Karuso."  TPC ¶ 84; <u>accord</u> <u>id.</u>

¶ 77 ("Kraus and Caruso have engaged in a calculated and persistent effort to use the lawsuits

already filed, including <u>Moskvovitz</u>, to force Swiss Life to make payments directly to them.").

In light of these facts, Kraus and Caruso could not have any claim of right to the proceeds of the

<u>Moskowitz</u> suit.  Indeed, Kraus and Caruso "did not commence <u>Moskovitz</u> for the benefit of the

plaintiffs and the nominal policyholders; rather, they initiated and [were] financing it as a tool to

extort additional money" from Swiss Life.  <u>Id.</u> ¶ 8.  Similarly, the third-party complaint

establishes that Kraus attempted to negotiate a payment directly to himself and Caruso in

exchange for the withdrawal of all policyholder lawsuits, including <u>Moskovitz</u>.  <u>Id.</u> ¶ 78(b).  The

third-party complaint also establishes that the threats made by Kraus and Caruso "put Swiss Life

in fear of economic injury," TPC ¶ 89, thereby demonstrating that Swiss Life "reasonably

believe[d]" that Kraus and Caruso "had the power to harm" Swiss Life and that Kraus and

Caruso "would exploit that power to [Swiss Life's] detriment," <u>Middlemiss</u>, 217 F.3d at 118.[4]

Under these circumstances, we believe that it is permissible to grant Swiss Life RICO damages

based on the <u>Moskovitz</u> lawsuit.  There is no risk of a "chilling" effect of the sort posited by

<u>Deck</u> and <u>FindTheBest.com</u>.  By holding Kraus and Caruso liable for RICO damages, the Court

will not be punishing the parties who could rightfully bring any lawsuit under the terms of the

insurance policies at issue — the policyholders.

As to the appropriate amount of damages in the form of attorney's fees, Swiss Life has

submitted a summary of contemporaneous time records showing the hours worked and the

hourly rates of Swiss Life's attorneys at Becker, Glynn, Muffly, Chassin and Hosinski LLP, who

worked on Swiss Life's defense of <u>Moskovitz</u>.  <u>See</u> Time Records; Conan Objection Decl. at 2-

4.  Swiss Life has also provided a description of each attorney's background and legal

experience.  <u>See</u> Conan Objection Decl. at 2-4.  One of Swiss Life's attorneys has also submitted

an affidavit explaining that he separated out the hours devoted to defending the <u>Moskowitz</u> suit

(for which fees are sought) from the hours spent prosecuting the RICO action against the third

party defendants.  <u>See</u> Chassin Decl. ¶¶ 2-11; Time Records.  The Court has reviewed this

information and is satisfied that Swiss Life has made a reasonable effort to separate out the hours

attributable to the extortionate litigation conduct and that the total number of hours sought for

this multi-year effort (7449.06) are reasonable.  Accordingly, Swiss Life should be awarded

attorney's fees as RICO damages for these hours in the amount of $2,811,009.  <u>See</u> Chassin

---

[4]  Some of these threats referred to in paragraph 89 were apparently made in contexts
unrelated to the policyholder litigation.  It is clear, however, that the threats described there refer,
at least in part, to threats made in connection with that litigation.

Decl. ¶ 6.

### 3.   Trebling of Damages Under RICO

The terms of the default judgment explicitly provide that "Swiss Life is entitled to treble damages . . . . "  Default Judgment at 2.  Therefore, Swiss Life's damages of CHF 45,399,522.85 from Kraus and Caruso's fraud should be trebled, resulting in an award of CHF 136,198,568.55. Similarly, Swiss Life's attorney's fees of $2,811,009 for defending Moskovitz, incurred as damages for extortion, should be trebled, resulting in an award of $8,433,027.  See generally Stochastic Decisions, Inc., 995 F.2d at 1167 (affirming district court's decision to treble legal fees as RICO damages).

### 4.   Conversion from Swiss Francs to U.S. Dollars

Swiss Life requests that its award be converted to United States dollars based upon an exchange rate reported by the Wall Street Journal at the close of business on March 27, 2014 — the day before it filed its papers.  Proposed Findings of Fact and Conclusions of Law at 15 n.3. "It is well settled that a money judgment by an American court must be in American currency." Shaw, Savill, Albion & Co. v. The Fredericksburg, 189 F.2d 952, 954 (2d Cir. 1951).  Swiss Life has not briefed the issue of what date the Court should use for converting its award from Swiss francs to U.S. dollars with respect to damages from Kraus and Caruso's fraud. "[F]ederal courts sitting in non-diversity cases have rather consistently adopted the judgment-day rule."  Vishipco Line v. Chase Manhattan Bank, N.A., 660 F.2d 854, 865 (2d Cir. 1981) (citations omitted). Under the "judgment day rule," a judgment denominated in a foreign currency is converted into dollars as of the date on which the judgment is rendered.  See Restatement (Third) of Foreign Relations Law § 823 cmt. d (1987).  While there is discretion to alter this practice, especially to make the injured party whole, see id. cmt. c, plaintiffs have not suggested any reason to depart

19

from this general principle.  Accordingly, the Clerk of Court should be directed to enter judgment in favor of Swiss Life in the U.S. dollar equivalent of CHF 136,198,568.55 as of the date of judgment for the damages attributable to Kraus and Caruso's fraud.  Cf. Sae Sadelmi S.p.A. v. Papua N.G. Elec. Comm'n, 1994 WL 669543, at *2 (S.D.N.Y. Nov. 29, 1994) (directing Clerk to enter judgment "in the U.S. dollar equivalent" of the foreign currencies at issue "using the applicable rates that exist as of the date judgment is entered" in a case where federal jurisdiction was premised on a federal statute).

III.  CONCLUSION

For the foregoing reasons, the Clerk should be directed to award Swiss Life a judgment in United States dollars against Moses Kraus and Caruso AG in the sum of $8,433,027 plus CHF 136,198,568.55, with the latter figure to be converted by the Clerk of Court to United States dollars pursuant to the exchange rate in effect on the date judgment is entered.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Colleen McMahon at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge McMahon.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile,

P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: July 21, 2014
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies mailed to:

Moses Kraus
34 Fountayne Road
London N167DT
Great Britain

Caruso AG
2 Stamford Hill
London N166XZ
Great Britain

Caruso AG
C/O Kranz Treuhand & Verwaltungs
Austrasse 49
Vaduz FL, 9490
Liechtenstein